SMITH, Receiver, Respondent, vs. STARKEY and others, imp., Appellants.

*November 12—December 9, 1930.*

For the appellants there was a brief by *Kopp & Brunck-horst* of Platteville, and oral argument by *Arthur W. Kopp*.

For the respondent there was a brief by *Brindley & Brewer* of Richland Center, and oral argument by *Francis Brewer*.

FRITZ, J. The ultimate question on this appeal is whether the defendants who have appealed are liable on a promissory note for $647.95, dated August 24, 1928, and signed "Farmers Elec. Line." Without any substantial conflict, the evidence establishes the following facts: The defendants, owners of farms near the city of Richland Center, in

the fall of 1919 agreed to join in the construction of an electric power line and the purchase by the group, from that city, of current, to be paid for as measured by a master meter. They decided not to organize a corporation or partnership. They did not adopt any trade name or designation for their group or project. Each was to contribute, as accounts became due, his proportionate amount of the cost of construction, and for current measured by the master meter in proportion to the amounts used by each, as shown by their respective individual meters. Each was to be liable only for his proportionate amount of the cost of construction and cost of current. They selected John Davis, one of their number, to inform each member as to what he was to contribute as the work proceeded, to collect such contributions, and, after receiving such contributions, to use them in paying the indebtedness. It was understood that C. R. Thomson, who was president of the First National Bank of Richland Center (hereinafter referred to as the bank), and also one of the group, was to assist John Davis, and that all contributions were to be paid at the bank, whose officers or employees were to keep books of account and records of the transactions of the group. All payments at the bank were deposited to the credit of an account entitled "John Davis, Treasurer," until January 1, 1925, and thereafter entitled "Farmers Electric Line, C. R. Thomson, Treasurer;" and checks drawn against that account were signed by the person selected from time to time by the group to act as treasurer. Purchases of materials were made, and orders for construction were placed, only after they were authorized at meetings of the defendants.

Deliveries of materials were made in February, 1920, and the line was completed and used to supply current during that year. John Davis informed each defendant from time to time as to his indebtedness for construction and for current. A few paid promptly, but others delayed so

that Davis could not pay all of the construction and current charges as they became due, although the defendants knew that failure to promptly pay for current might result in shutting it off at the master meter. Nevertheless, John Davis and his successors as treasurer paid the outstanding bills promptly by overdrawing the account at the bank. By April 21, 1920, the overdraft was $105.37, and it increased until it amounted to $1,475.89 on February 27, 1923. Without any express authority to obligate the other defendants, but to cover such overdrafts, John Davis and C. R. Thomson gave the bank their personal notes for $200 on June 28, 1920, $334.27 on September 10, 1920, and $350.05 on May 5, 1921.

In the spring of 1923 a majority of the defendants attended a meeting and examined a written statement which had been prepared from the records kept by the bank and which was submitted by C. R. Thomson. That statement was considered a final settlement, and it showed the total debits and credits of each defendant on account of construction and of current; and also each defendant's unpaid indebtedness, which aggregated $1,499.37, and of which $463.51 were charged to Scott Stewart and Willis Stewart. None of the members were then, or at any other time, informed that the bank account had been overdrawn, or that moneys had been advanced by the bank, or notes given for such overdrafts or advancements. At that meeting C. W. Davis was selected to succeed John Davis as treasurer. No books of account were audited or received by C. W. Davis. He was told by John Davis that all indebtedness owing by the group had been paid. Thereafter the only payments which he made were by the checks which he issued to the city for electric current. He did not keep track of the bank account, or the payments by defendants which were credited to that account. However, when some of the defendants did not make the required contributions for cur-

rent promptly, overdrafts occurred, and meetings were called in December, 1923, and August, 1924, at which the delinquents paid their arrears for current. John Davis never signed any notes in relation to those transactions. He resigned at a meeting held in January, 1925, and C. R. Thomson was selected to act as treasurer, and he attended to the collections and payments for current until the Wisconsin Power & Light Company took over the line in 1926, and thereafter rendered bills directly to each defendant for the current which he used.

It appears that on April 14, 1923, the balance owing to the bank was $490, which, except for a small amount attributable to interest that had accrued on prior loans, was then still owing because of the failure of the Stewarts to pay the $463.51 which had been charged to them. For that balance of $490, C. R. Thomson, on August 3, 1923, gave the bank a renewal note, which he signed "Farmers Electric Line." That note has never been paid. Renewal notes, signed in the same manner, were given to the bank by C. R. Thomson from time to time, for the principal and accruing interest, until the note in suit for $647.95 was given, on August 27, 1928. When that note was given, Fred Thomson, who was cashier of the bank, and C. R. Thomson, knew that all of the defendants except the Stewarts had paid all of their respective obligations for their share of the advancements which the bank had made, and that C. R. Thomson gave the renewal notes to cover only the balances unpaid of the amounts charged to the Stewarts. When the Wisconsin Power & Light Company began to furnish the current, in 1926, Fred Thomson knew that there remained nothing for the defendants to do as a group, and that there was nothing further for C. R. Thomson to do for the group, as treasurer or otherwise.

Until after the plaintiff was appointed receiver, none of the defendants, except C. R. Thomson, ever knew that any

of the notes had been given, and no demand was ever made on any of the defendants, except the Stewarts and C. R. Thomson, for payment of the $490 balance which was owing on April 14, 1923, or of any of the renewal notes which were given subsequently for that balance and accruing interest.

In addition to the foregoing facts established without contradiction, there is testimony that the failure of the Stewarts to pay all the amounts charged against them for construction was due to a dispute between C. R. Thomson and Willis Stewart as to who was liable for the share of construction cost chargeable to a forty-acre tract which the latter had contracted to purchase from C. R. Thomson after the construction work was under way. Scott Stewart subsequently purchased that tract, and in 1926, when the Wisconsin Power & Light Company took over the power line and was required to compensate each defendant for his interest in the line, the compensation apportioned to that tract was given to Scott Stewart, with the consent of Willis Stewart and C. R. Thomson, and to the knowledge of Fred Thomson.

There was also testimony by C. R. Thomson that it was necessary to borrow at times because of the delinquencies of some of the defendants in paying the amounts which they were to contribute. However, he did not remember ever telling them that money had been borrowed.

Manifestly, the defendants were jointly interested and engaged in the construction of the power line as a unit, and in obtaining current from the city, which was to be charged to them as a unit, as far as the city was concerned, but which was to be used by them individually for their respective private purposes. Each was to be liable, as between themselves, only for his fractional share of the cost of construction and for such portion of the current as was used by him. It was not their purpose to engage in business,

collectively or individually, for the sale of anything contracted for by them. They did not contemplate or undertake to carry on, as a group, any business for profit. Hence they did not constitute a partnership within the definition of sec. 123.03, Stats. Neither were they engaged in anything similar or equivalent to the joint adventure to speculate in land and engage in extensive agricultural operations which was involved in *Reinig v. Nelson,* 199 Wis. 482, 227 N. W. 14, and the conduct of which rendered it necessary for the appointed business manager to avoid forfeiture or foreclosure by borrowing money to pay overdue taxes and interest on mortgage loans which had been duly authorized. The subject matter of the transactions which the appellants authorized was but the construction of a single power line to transmit current only for their respective private purposes, and, in relation to which, contracts were made only as expressly authorized at their meetings. They were to have but one type of transactions, viz. the receipt and payment of moneys as required to meet charges for construction and current. The business of collecting and paying such moneys was intrusted to a treasurer, who was, however, expressly instructed to make such payments only as he received the money from the members.

Persons having notice that they are dealing with an agent are bound to inform themselves of the extent and limitations of his authority. As neither John Davis nor C. R. Thomson was expressly authorized to execute negotiable paper on behalf of the other defendants, such power must be shown to have been necessary to the exercise of the power expressly conferred, and the burden of proof was upon the plaintiff to establish such implied authority. An agent has not such implied power merely by reason of his having general authority to manage the business of his principals. *Pluto Powder Co. v. Cuba City State Bank,* 153 Wis. 324,

329 *et seq.,* 141 N. W. 220; *Outagamie County Bank v. Tesch,* 171 Wis. 249, 177 N. W. 6; *Schumacher v. Sumner Tel. Co.* 161 Iowa, 326, 142 N. W. 1034. In the *Pluto Powder Co. Case, supra,* the court quoted with approval. from sec. 77 of Tiedeman on Commercial Paper, which is in part as follows:

"And the execution and negotiation of commercial paper are considered by the commercial world so liable to the infliction of injury on the principals, if this authority is given to agents—the general custom being to reserve this power for personal exercise,—that the presumption of the law is more strongly opposed to an implied authority to execute and negotiate commercial paper than to do anything else. Hence, in this connection, the rule is strictly enforced, that the authority to execute and indorse bills and notes as agent will not be implied from an express authority to transact some other business, unless it is *absolutely* necessary to the exercise of the express authority."

In the case at bar, neither the borrowing of money nor the issuance of negotiable notes was necessary to the exercise of the authority conferred on John Davis and C. R. Thomson to collect from the defendants the amounts respectively owing by them, and using such collections to discharge indebtedness owing by the group to materialmen and contractors for construction and to the city for current. When defendants failed to pay promptly the amounts which they were to contribute on call of their treasurer, there was nothing more that he was authorized to do toward the payment of the debts. He was unable to pay by reason of the delinquency of the defendants, but, on the other hand, he was under no obligation to any one to act further in relation to making such payments or procuring funds for that purpose. It was not absolutely necessary to borrow from the bank or issue negotiable paper on defendants' behalf. That may have been the more convenient or least troublesome

course to pursue, but those considerations do not afford sufficient basis to imply the existence of authority on the part of John Davis or C. R. Thomson to execute negotiable paper as agents of the defendants.

Furthermore, none of the defendants' names appear upon the note in suit. On its face it does not purport to be an obligation of the defendants. On the contrary, the bank's cashier, Fred Thomson, knew when it was signed "Farmers Elec. Line" by C. R. Thomson, that he did not do so on behalf of the appellants or to bind any of them. The records and accounts of the defendants' transactions, which had been kept by the bank, afforded notice to it that most of the indebtedness of $490, for which the note of August 3, 1923, had been issued in the name of "Farmers Electric Line," represented unpaid obligations of the Stewarts; and that it was only to cover the Stewarts' obligations and accrued interest that the note in suit was executed by C. R. Thomson some time after the power line had been taken over by the Wisconsin Power & Light Company, and there was no longer any occasion for him to act for the appellants in any respect. It follows that the court erred in directing a verdict for the recovery of the amount of the note from the appellants. They are entitled to judgment dismissing the complaint as to them.

*By the Court.*—Judgment reversed as to the appellants, with directions to amend the judgment so as to provide for the dismissal of the complaint as to appellants.