COMMONWEALTH TELEPHONE COMPANY, Respondent, vs. PALEY and another, Appellants.

*November 12, 1930—February 10, 1931.*

For the appellants there was a brief by *Bagley, Spohn, Ross & Stevens* of Madison, and oral argument by *Myron H. Stevens* and *W. H. Spohn.*

For the respondent there was a brief by *Schubring, Ryan, Clarke & Petersen,* attorneys, and oral argument by *William Ryan* and *Ralph E. Axley,* all of Madison.

The following opinion was filed December 9, 1930:

OWEN, J. The Commonwealth Telephone Company is the proprietor of a telephone system and lines, with its principal place of business at Madison, Wisconsin. It maintains a telephone exchange at the city of Mineral Point. On or about the 20th of March, 1929, it had in its possession at Mineral Point a quantity of junk consisting of copper, copper wire, and lead cable resulting from its reconstruction work at that point. It desired to sell the same, and advertised for bids. Sam Mead, a junk dealer at Mineral Point, telephoned his bid into the principal office at Madison on Friday afternoon. On Saturday afternoon L. F. Shepherd, the plaintiff's local manager, called upon Mead and told him that his bid had been accepted. Mead told him he would load the junk as soon as he could get a freight car for its transportation. Tuesday afternoon Mead telephoned Shepherd that he would load the junk the following Wednesday morning. Wednesday morning Shepherd appeared at the

warehouse where the junk was stored and witnessed its removal from the warehouse. He was present practically all of the time during the process of removal. The junk was weighed on public weighing scales at Mineral Point and the weight slips were delivered to Shepherd.

The junk was consigned and transported to Paley Bros. of Madison, the defendants in this case, who bought the same from Mead and paid him therefor. Two or three days thereafter Shepherd sent the weight slips to the principal office of the plaintiff company at Madison with a letter of transmittal stating, "Inclosed find the weight tickets on the junk cable and copper wire sold to Mr. Sam Mead. There were 31,680 pounds of junk cable and 180 pounds of junk copper wire." Receipt of this communication was acknowledged by C. R. Brown, chief engineer of the plaintiff company, in the following language: "We are in receipt of the weight tickets of the cable sold to Sam Mead and are wondering if you have collected from him for its sale. If not, we would suggest that you do so without delay, as we do not want to extend any credit to junk men. Kindly let me hear from you on this at once." Repeated efforts on the part of the plaintiff to collect the purchase price of the junk from Mead proved unavailing, and on the 6th day of September, 1929, without having made any previous demand upon the defendants, plaintiff brought this action to recover from them the reasonable value of the junk. The jury returned a general verdict in favor of the plaintiff.

The principal issue litigated involved the authority of Shepherd as the agent of the plaintiff to make delivery of the junk. It is apparent that if Shepherd had authority to make delivery, such delivery made the contract of sale a valid one within the statute of frauds (secs. 121.04, 241.03) and passed the title to Mead under the Uniform Sales Act, sec. 121.19. *Boscobel v. Muscoda Mfg. Co.* 175 Wis. 62, 183 N. W. 963. It is the rule that a person dealing with an agent

known to be acting for a principal must at his peril ascertain the extent and nature of the agent's authority, and the court correctly charged the jury that the burden of establishing the authority of Shepherd to make delivery of the junk to Mead was upon the defendants. *Boelter v. Hilton,* 194 Wis. 1, 215 N. W. 436; *Pluto Powder Co. v. Cuba City State Bank,* 153 Wis. 324, 141 N. W. 220. However, this rule is to be read in connection with another rule stated in *Mc-Dermott v. Jackson,* 97 Wis. 64, 72 N. W. 375, quoted approvingly in *Voell v. Klein,* 184 Wis. 620, 622, 200 N. W. 364, that "If a third person, because of appearances for which the principal was responsible, believes and has reasonable ground to believe that the agent possessed power to act for the principal in the particular transaction, if such third person was, in the exercise of reasonable prudence, justified in believing that the agent possessed the necessary authority, then the principal is responsible to such third person the same as if the agent possessed all the power he assumed to possess."

The evidence in this case showed that Shepherd was the local manager of the plaintiff at Mineral Point, his general duties being to "clear trouble, maintain the switchboard, and see that rentals were collected." These recognized duties and conceded authority must be given significance in determining whether Mead in the exercise of reasonable prudence was justified in believing that Shepherd had authority to make delivery of the junk. Within a rather wide field he was the general spokesman of the company at Mineral Point. In addition to that, when the company at Madison determined to accept Mead's bid for the junk, it directed Shepherd to notify Mead that his offer had been accepted. It appears that prior to this time Shepherd had sold a small amount of junk to Mead, and Shepherd testified upon the trial that he had authority to make such sales up to the amount of $5. Shep-

herd also sold to Mead 180 pounds of copper wire which was delivered to and received by Mead along with the lead cable. Mead conducted negotiations with no other person in consummating the purchase of the copper wire. Shepherd was present and assumed to act for the company during the time that the junk was being moved out of the warehouse where it was stored. He supervised the weighing and took possession of the weight tickets and mailed them to the home office at Madison. Upon the receipt of the weight tickets there was no challenge of the authority of Shepherd to make delivery of the junk nor was there any repudiation of his conduct in such respect. The incident seems to have been treated as a matter of course at the home office and Shepherd was instructed to make immediate collection for the junk from Mead, as the company did not want to "extend any credit to junk men."

When it is considered that Shepherd acted as the manager of the company at Mineral Point in a rather general way, that the company instructed him to notify Mead that his bid had been accepted, that he had assumed to sell Mead small quantities of lead cable before this incident, that the copper cable was sold to him by Shepherd, that Shepherd was present during the taking of the junk from the warehouse, that he supervised the weighing thereof, took possession of the weight slips and mailed them to the Madison office, it leaves no room for doubt that Mead, or any person similarly situated, was justified in believing that Shepherd possessed the authority to make delivery of this junk. Furthermore, if there were any doubt as to what his authority appeared to be to one in Mead's situation, there can be no escape from the conclusion that if Shepherd acted without authority his acts were fully ratified by the home office. When his acts in making delivery of the junk came to the knowledge of the principal office, his authority was not challenged in any way.

He was instructed to make collection from Mead. This instruction was followed by repeated attempts on the part of the company to make collection from Mead, even to placing the claim in the hands of attorneys. There was no attempt made to recapture the junk or to exercise the right of stoppage *in transitu,* or to deny in any shape or manner that title to the goods had passed to Mead until the time of the commencement of this action, more than five months after the delivery of the goods. It is clear that the title to the goods passed with their delivery to Mead, unless that delivery was induced by fraud, making Mead's possession of the goods unlawful.

Such a contention is made, based upon a more or less casual remark made by Mead to Shepherd when the latter informed him of the acceptance of his bid. Shepherd testified that he asked Mead at the time if he was square with the home office, and Mead said he was. It is said that Shepherd's delivery of the junk was made in reliance upon this assurance. Construing this conversation as a statement on the part of Mead that he had paid for the junk at the home office, it is plain that Shepherd had no right to rely on it. He knew that payment for the junk could not be made until it had been weighed. He knew that it had not been weighed, therefore he must have known that it could not have been paid for at the home office, and he had no right to construe the remark made by Mead as a statement that he had paid for the junk, and to rely thereon in making delivery to Mead.

*By the Court.*—Judgment reversed, and cause remanded with instructions to render judgment in favor of the defendants, dismissing the complaint.

A motion for a rehearing was denied, with $25 costs, on February 10, 1931.