SELL and others, Respondents, vs. GENERAL ELECTRIC SUPPLY CORPORATION, Appellant.

*February 16—March 15, 1938.*

For the appellant there were briefs by *Genrich & Genrich,* attorneys, and *Miles Lambert* of counsel, all of Wausau, and oral argument by *Mr. Lambert* and *Mr. F. W. Genrich, Jr.*

For the respondents the cause was submitted on the brief of *Bird, Smith, Okoneski & Puchner* of Wausau.

MARTIN, J. Respondents are retail hardware dealers, in the city of Wausau. Defendant-appellant is a wholesale distributor of electrical household appliances, including a refrigerator sold under the trade name of "Hotpoint." On March 17, 1937, R. W. Cooke, a salesman representative of the defendant, called upon the plaintiffs, who at that time were without a line of electric refrigerators in their store. After some negotiations, plaintiffs gave Cooke an order for five refrigerators at specified prices. This order was signed by Cooke. He testified the order was taken subject to approval by his superiors at their Milwaukee office. Plaintiffs claim an outright agreement of sale was made. At the time the order was taken, plaintiffs executed, in blank, a note, attached to a form of trust receipt used by the General Electric Contracts Corporation, and at the same time delivered to Cooke a check for ten per cent of the purchase price of said refrigerators, payable to the General Electric Contracts Corporation. General Electric Contracts Corporation is an

independent sales-financing corporation, affiliated with the General Electric Supply Corporation and the General Electric Company. That is, defendant General Electric Supply Corporation is the sales corporation of General Electric Company, and General Electric Contracts Corporation is the finance company. The General Electric Contracts Corporation purchases customers time-sales contracts from dealers; also extends credit to dealers on their purchases.

On April 2, 1937, the General Electric Contracts Corporation notified the plaintiffs that they would extend credit to them and would purchase their customers contracts. No definite date of delivery was stated in the order or agreed upon. On April 5, 1937, the defendant wired plaintiffs as follows:

"Extremely sorry we are unable to ship refrigerators as requested Stop Therefore check for ten per cent of initial order is being returned."

And on April 6, 1937, defendant wrote plaintiffs as follows:

"Supplementing our telegram of April 5th in reference to your order for Hotpoint refrigerators, we are extremely sorry that we are unable to ship this merchandise to you as originally intended.

"The delay in securing refrigerators from our factory has seriously handicapped us in securing enough refrigerators for our *established dealers* and rather than disappoint you after shipping a few refrigerators, we believe it will be for the best if we do not attempt *to establish another dealer outlet.*

"This order was greatly appreciated. We are notifying our representative, Mr. R. W. Cooke, of this decision by copy of this letter, and we are asking him to stop in and see you the next time he is in Wausau to explain this further. We will be pleased to supply you with other merchandise and will continue to send you literature, etc., on other products."

Mr. Cooke testified, in part, as follows:

"My duties were to call on the established dealers of the Supply Corporation. I would assist their salesmen in clos-

ing some of the sales of their customers and going out to see the customer, and so on. I arranged their advertisements in the newspapers and assisted their servicemen in the servicing of merchandise that they had. . . . In respect to refrigerators, I called on dealers. On the morning of March 17th, I heard from another dealer that Kelvinator had changed their outlet in Wausau and was told that the old Kelvinator dealer was Sell Brothers. At that time we did not have any outlet here for refrigerators. Prior to this time I had investigated other places and called the attention of the company to a dealer outlet. . . . I talked to Mr. Arnold Sell and also several other men and introduced myself as being the representative of the General Electric Supply Corporation. I told them what lines our organization was selling, that I understood that they had just lost the Kelvinator agency and asked them if they were interested in a line of refrigerators, and I proceeded to tell them the outstanding features of the Hotpoint line. . . . We discussed the proposition of having them appointed dealer. . . . We went into quite a little detail in the methods we followed and the policy of the refrigerator business. . . . I brought out the point that all orders and new accounts in our organization were subject to the approval of Mr. Winters, our operating manager, in Milwaukee. I explained that the policy in the refrigerator business was to sell to the dealer on a c. o. d. basis. But in order to give our dealers a little added financing, we had made arrangements through an independent finance company, the General Electric Contracts Corporation, whereby the dealer could purchase these refrigerators with ten per cent down payment and pay the balance as they sold them, with the limit of 60 days. . . . I was only authorized to call on authorized dealers. I discussed with Sell's having them appointed dealers. . . . I told Sell Brothers that the right to the completion of that offer was based upon the decision of our operating department. I told Mr. Arnold Sell that. . . . I told Arnold Sell what my duties were. I told him that I called on dealers to give them sales help, service help, advertising assistance and take care of the immediate problems that they had, after they were established dealers. . . . I explained how the

dealer was to get credit from the finance corporation. That was the time John L. Sell signed Exhibit C. [Exhibit C is the trust receipt with attached promissory note signed in blank by Sell Brothers Hardware Company, with blank form bill of sale attached unsigned.] . . . Exhibit C was taken for the purpose of being turned over to the Contracts Corporation. The Supply Corporation was to be paid by the Contracts Corporation. Exhibit C was given for that purpose. I also took Exhibit 3, payable to the Contracts Corporation. [Exhibit 3 is a check of Sell Brothers Hardware Company to General Electric Contracts Corporation for $63.10, covering the ten per cent down payment on the refrigerators.] . . . The General Electric Supply Corporation is the one that makes the sales and ships the goods. The Contracts Corporation does the financing and discounts contracts by customers; so far as the Supply Corporation is concerned, by virtue of the Contracts Company discounting the sales contracts, they get their money in full."

Mr. L. D. Morgridge testified on behalf of the defendant, in part, as follows:

"I am district sales manager for the General Electric Supply Corporation for the district known as the Milwaukee district, which includes Wausau. . . . In the sale of refrigerators it is customary to establish dealers and sell refrigerators to them only. The managing department at Milwaukee selects the dealers for the company within the state of Wisconsin. The only thing a salesman would have to do with it is to recommend an account as a possible dealer. We, in the executive end, look over the territory; determine whether we want the dealer; what we think he could do for us over a period of time. . . . An investigation is made of his reputation, credit facilities, etc. When a dealer is established, he pays for the merchandise on a cash basis or financed on what we term a floor plan of some finance company. . . . We get the cash direct from the dealer or from the finance corporation. . . . Mr. Cooke was authorized to call on authorized dealers for Hotpoint refrigerators. He had no authority to call on Sells. He had authority to go to authorized dealers and take an order

from them. . . . I was a superior of Mr. Cooke as a salesman. I gave him no written instructions. His instructions were verbal. . . . We equip him with these forms, catalogs and folders."

At the conclusion of the evidence, in ruling upon defendant's motion for a directed verdict, the court said:

"I will say now, there is no evidence of actual authority to establish an agency to sell these goods. The question for this jury is to determine whether or not there was such a holding-out of this salesman Cooke as being authorized as to bind the company."

We agree with the learned trial judge that there is no evidence of actual authority on the part of the agent, Cooke, to establish an agency for a sale of the refrigerators in question. Three elements are necessary to establish apparent agency: (1) Acts by the agent or principal justifying belief in the agency; (2) knowledge thereof by the party sought to be held (in the instant case, appellant); (3) reliance thereon by the plaintiff, consistent with ordinary care and prudence. *Hansche v. A. J. Conroy, Inc.,* 222 Wis. 553, 561, 269 N. W. 309.

"The apparent authority for which the principal may be liable must be traceable to him, and cannot be established by the acts and conduct of the agent. The principal is only liable for that appearance of authority caused by himself. *Maryland Casualty Co. v. Moon,* 231 Mich. 56, 203 N. W. 885, 887; *Berryhill v. Ellett* (C. C. A.), 64 Fed. (2d) 253, 256. If words or conduct of the agent are relied upon, it must be shown that the principal had knowledge of and acquiesced in them. 1 Mechem, Agency (2d ed.), p. 513, § 725; *Berryhill v. Ellett, supra,* p. 256, and cases cited." *Hansche v. A. J. Conroy, Inc., supra.*

The burden of proof to establish the apparent authority of Cooke was upon the plaintiffs. *Smith v. Starkey,* 203

Wis. 56, 62, 233 N. W. 576; *Commonwealth Telephone Co. v. Paley,* 203 Wis. 447, 449, 233 N. W. 619; *Hansche v. A. J. Conroy, Inc., supra,* p. 562. In *Commonwealth Telephone Co. v. Paley, supra,* the court said:

"It is the rule that a person dealing with an agent known to be acting for a principal must at his peril ascertain the extent and nature of the agent's authority. . . . *Boelter v. Hilton,* 194 Wis. 1, 215 N. W. 436; *Pluto Powder Co. v. Cuba City State Bank,* 153 Wis. 324, 141 N. W. 220. However, this rule is to be read in connection with another rule stated in *McDermott v. Jackson,* 97 Wis. 64, 72 N. W. 375, quoted approvingly in *Voell v. Klein,* 184 Wis. 620, 622, 200 N. W. 364, that 'if a third person, because of appearances for which the principal was responsible, believes and has reasonable ground to believe that the agent possessed power to act for the principal in the particular transaction, if such third person was, in the exercise of reasonable prudence, justified in believing that the agent possessed the necessary authority, then the principal is responsible to such third person the same as if the agent possessed all the power he assumed to possess.' "

The respondents contend that the jury's finding of apparent authority is sustained by the fact that the agent, Cooke, had in his possession order forms, blank promissory notes, receipts, and bills of sale, in fact all the usual supply of literature which the local dealer might have occasion to use in selling the defendant's line of refrigerators. It must be kept in mind that this literature was furnished to Mr. Cooke for use in the discharge of the duties within the scope of his actual agency. That is, for the transaction of business with the authorized dealers selected and appointed by the defendant's executive officers in the district office in the city of Milwaukee. While Mr. Cooke called upon the respondents without authority from his principal, made a sale of some vacuum cleaners, and took an order for five Hotpoint

refrigerators, also the respondents' check for a down payment of ten per cent, together with a note executed in blank for the balance, these acts did not constitute the respondents, the defendant's local dealer in Wausau. Respondents cite the case of *Prah v. Ebener,* 200 Wis. 40, 227 N. W. 256, in support of their contention in the instant case. We think the facts are clearly distinguishable.

The appellant and respondents had no previous business transactions. Arnold Sell testified that he was the member of the Sell Brothers Hardware Company in charge of the electrical household appliances; that he had been in the store eighteen years, had never seen Mr. Cooke before; that for credentials Mr. Cooke had his billfold, advertising showing different models of refrigerators, and contract forms.

"He showed us how to make out contract forms and all that—everything for an agency. . . . He did not mention that the sale had to be approved by the Milwaukee office, except so far as our financial statement was concerned. He gave us a form of financial statement to fill out and send to this finance contracts corporation.

"We knew when he [Cooke] was talking to us on March 17th and 18th that we weren't the authorized dealers for Hotpoint refrigerators. We understood if we were made dealers that he wouldn't sell anybody else Hotpoint refrigerators in the city of Wausau."

He was asked:

"*Q.* Before you could get General Electric goods you had to be an agent? *A.* Absolutely. He sold us the agency that day.

"*Q.* Is your suit here for damages because they didn't deliver five refrigerators to you, or is it because you weren't appointed dealer; which? *A.* Both."

He further testified:

"When he [Cooke] came in to see us the first time he did not tell us that he had taken it up with the company about

having us appointed authorized dealer. He said that he had heard we weren't affiliated with Kelvinator, but I don't remember that he said he learned it that day. I understood he had learned of it since he came to Wausau. I understood he was a traveling salesman. We thought we were getting the agency for the General Electric Supply Corporation."

Hugo Sell testified, in part, as follows:

"I have heard Arnold Sell's testimony and it is substantially correct. . . . He [Cooke] said he was looking for dealers and they weren't going to sell utility companies. . . . I understand that nationally advertised articles are sold by just one dealer in a town. The salesman calls on just that dealer. We sell Lennox furnaces. No other dealer in Wausau sells them. The salesman comes around and calls on us and takes our orders and fills them."

Arnold and Hugo Sell were the only witnesses who testified on behalf of the plaintiffs. They both knew that refrigerators were sold only through duly appointed local dealers, so the only apparent authority upon which they would be entitled to rely would be the appearance of authority to select and establish a local dealer in Wausau. There is no evidence that Cooke had any authority in the selection or appointment of local dealers. Presumably there are a number of factors taken into consideration in making such appointments aside from the matter of credit rating. The apparent authority for which the principal may be liable must be traceable to him. It cannot be established by the acts and conduct of the agent. There is no evidence that the principal ever authorized Cooke to establish a local agency or ever authorized him to sell its refrigerators to anyone other than a duly appointed dealer.

The plaintiffs have the burden of proof not only to establish the apparent authority of Cooke, but also to show that such agency on the part of Cooke was sufficiently extensive to bind the defendant by his conduct. *Fredonia Canning*

*Co. v. Sergeant & Nicholoy, Inc.,* 223 Wis. 8, 15, 269 N. W. 697, and cases cited. Plaintiffs have failed to establish this burden of proof. We must hold upon the evidence, notwithstanding the verdict of the jury, that when Mr. Cooke left the plaintiffs' place of business on March 18, 1937, with the order in question, no contract had been consummated between the plaintiffs and defendant.

The plaintiffs further contend that if the agent, Cooke, did not have authority to make an outright sale of the refrigerators, thereafter, the order for same was accepted by the defendant by retaining the order and not disaffirming the transaction until April 5th. The order must be considered in connection with whatever transaction was had in contemplation of appointing plaintiffs as defendant's local dealer in the city of Wausau. Plaintiffs understood that they could not get the refrigerators in question, unless and until, they were made local dealer. Subsequent to March 18th there was no communication between plaintiffs and defendant until April 5th, on which date plaintiffs wired the defendant, addressed to its Milwaukee office, as follows:

"Must have definite answer today regarding refrigerators wire answer Western Union."

To this wire, defendant wired plaintiffs as follows:

"Extremely sorry we are unable to ship refrigerators as requested Stop Therefore check for ten per cent of initial order is being returned."

Defendant wrote the plaintiffs, under date of April 6th, as follows:

"Supplementing our telegram of April 5th in reference to your order for Hotpoint refrigerators, we are extremely sorry that we are unable to ship this merchandise to you as originally intended.

"The delay in securing refrigerators from our factory has seriously handicapped us in securing enough refrigera-

tors for our established dealers and rather than disappoint you after shipping a few refrigerators, we believe it will be for the best if we do not attempt to establish another dealer outlet.

"This order was greatly appreciated. We are notifying our representative, Mr. R. W. Cooke, of this decision by copy of this letter, and we are asking him to stop in and see you the next time he is in Wausau to explain this further. We will be pleased to supply you with other merchandise and will continue to send you literature, etc., on other products."

This letter definitely rejected any negotiations theretofore had, looking to the possible appointment of the plaintiffs as the local dealer in Wausau. The letter states:

"The delay in securing refrigerators from our factory has seriously handicapped us *in securing enough refrigerators for our established dealers* and rather than disappoint you after shipping a few refrigerators, we believe it will be for the best if *we do not attempt to establish another dealer outlet.*

" 'Generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer,' citing *Grice v. Noble,* 59 Mich. 515, 26 N. W. 688; *Royal Ins. Co. v. Beatty,* 119 Pa. St. 6, 12 Atl. 607, 4 Am. St. Rep. 622; *More v. New York Bowery F. Ins. Co.* 130 N. Y. 537, 29 N. E. 757. See, also, 1 Page, Contracts, § 160." *Morris F. Fox & Co. v. Lisman,* 208 Wis. 1, 13, 237 N. W. 267, 240 N. W. 809, 242 N. W. 679.

In *Morris F. Fox & Co. v. Lisman, supra,* speaking of the above rule, the court said:

"This rule is of course subject to exceptions. If the relations between the parties have been such as to give to silence the significance of an assent to the offer, the offeree's silence may amount to an implied acceptance. *Hobbs v. Massasoit Whip Co.* 158 Mass. 194, 33 N. E. 495. Or, if the conduct of the offeree is such as to lead the offeror to believe that the offer has been accepted, there may be an acceptance by estoppel. 1 Page, Contracts, § 161."

In the instant case, there were no former relations between the parties. The only manifestations to the offeror by the defendant are the telegram and confirming letter, above quoted, each rejecting the offer. The fact that the letter indicates that the offeree had originally intended to accept is of no consequence because an unmanifested intent to accept is of no legal consequence. There is no evidence from which the court or jury might find a contractual acceptance. The defendant's motion for a directed verdict should have been granted.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the action.