Morris F. Fox & Company, Respondent, vs. Lisman and others, imp., Appellants.

*May 15, 1931—May 10, 1932.*

For the appellants there were briefs by *Bender, Trump, McIntyre & Freeman,* attorneys, and *Ronold A. Drechsler* of counsel, all of Milwaukee, and oral argument by *Mr. Rodger M. Trump* and *Mr. Drechsler.*

For the respondent there were briefs by *Miller, Mack & Fairchild,* and oral argument by *J. Gilbert Hardgrove,* all of Milwaukee.

The following opinion was filed June 22, 1931:

WICKHEM, J.   During the months of July and August, 1927, the defendant F. J. Lisman & Company and B. J. Van Ingen Company, investment bankers, contemplated the purchase of an issue of $4,500,000 of General Vending Corporation bonds.  This corporation owned or was about to acquire all of the outstanding capital stock of a number of weighing-machine companies, and the purpose of the issue was to furnish the means to purchase such stock, retire certain obligations, finance improvements of penny scales, purchase gum-vending machines, and furnish working capital. Before this issue assumed definite form the defendant F. J. Lisman & Company and its associate undertook to interest four or five bond houses in the United States in taking "banking-group participations" for the disposition of the bonds referred to.   In accordance with this plan they sent one Monger, a wholesale salesman, to Milwaukee.  Monger first offered this participation to Morris F. Fox & Company, but was refused.   He thereupon presented the proposition to the defendant Dahinden-Schmitz Company, and this company accepted the participation.   The "banking-group participation" imposes a liability upon each participant for the ultimate sale or disposition of a stipulated portion of the bonds.   The effect of this agreement is that each member takes the responsibility for a portion of the bonds, guaranteeing their sale and accepting the risk of their non-sale.   The division into four or five or more of such participating groups results in reducing the liability of the promoters,

who in this case are the defendant F. J. Lisman & Company, and its associate, B. J. Van Ingen Company. In return for this form of participation a higher commission is paid to the banking-group participants than is paid to those who belong merely to the selling group. The "banking-group participation," unless accompanied by participation in the selling group, does not involve the purchase of bonds. The obligations involved are customarily discharged by securing a sufficient selling-group participation to take care of the liability, and if such selling group is acceptable to the promoter or underwriter, and pays for the bonds subscribed for, the liability ceases. "Banking-group participation" can and may be the only participation that a particular company has, but customarily it is required that it be combined with participation in the selling group. The selling group does involve purchase of bonds by members to the amount of the subscription. It is the claim of defendant that the arrangement with Dahinden-Schmitz Company involved their participation in the selling group, although it is conceded that this company never executed the selling-group contract. Whether the Dahinden-Schmitz Company was in the banking group only, or also in the selling group, the amount of their subscription was $250,000 originally and $460,000 ultimately. The telegram asking for participation, as well as the letter of confirmation by the defendant F. J. Lisman & Company, are dated September 15, 1927.

Between September 15 and September 30, 1927, a representative of Dahinden-Schmitz Company approached Grossman-Lewis Company and disposed of $75,000 of these bonds, and also disposed of $76,000 to Morris F. Fox & Company, and various amounts to several other customers. After finding that they had placed practically the entire $250,000, Dahinden-Schmitz Company increased their commitment to $350,000. This transaction was completed on September 30, 1927. On October 1st, at 1:49 p. m., Morris

F. Fox & Company telegraphed Lisman & Company for $25,000 additional General Vending Corporation bonds in banking or selling group, and at 2:33 the same afternoon one Fleming, acting on that afternoon in place of one Traugott, who had charge of the matter, wired "O. K. twenty-five thousand Vending will protect you twenty-five thousand additional will phone you Monday morning." The same afternoon Dahinden-Schmitz Company wired Lisman & Company as follows: "Have order from Morris Fox & Company for Vending bonds. Understand they wired for additional bonds. Do not confirm without consulting us before all our bonds are applied for." Defendant claims that on October 3d Traugott telegraphed Morris F. Fox & Company as follows: "We have arranged Dahinden-Schmitz take care of your wants Vending. This includes twenty-five bonds confirmed you Saturday together with your request twenty-five additional." An office copy of this wire was offered for identification, but it was not received in evidence and there is a question both as to its having been sent and as to its admissibility.

On October 3d Morris F. Fox & Company filled out a blank selling-group circular and mailed it with a letter dictated by its vice-president. The following statement in his letter is of importance:

"This purchase is, of course, predicated upon the understanding that an application will be filed with the Railroad Commission of Wisconsin for these bonds and that they will receive a class A rating."

This letter was not acknowledged by defendant F. J. Lisman & Company, but was filed with a pencil memorandum which reads as follows: "Mr. Lyon advises Boston listing takes care this—if not we make application direct as reg. dealers this state."

Mr. Lyon was the office expert of Lisman & Company on Blue Sky matters. On October 3d Dahinden-Schmitz Com-

pany, as heretofore stated, by letter to Morris F. Fox & Company confirmed the sale of $125,000 of bonds, subject to the terms of the selling group and with no reference to the proviso in plaintiff's letter. On October 6th Dahinden-Schmitz Company wrote Morris F. Fox & Company a letter to the effect that there would be due October 10th a total of $123,649.86 against delivery of $125,000 par value interim receipts of Lisman & Company, countersigned by the Central Union Trust Company. The same letter was sent by Dahinden-Schmitz Company to all of its selling-group participants. Thereafter the interim certificates were forwarded directly to Morris F. Fox & Company. The bonds sold readily and Morris F. Fox & Company were unable to get additional bonds without paying a premium. On October 21st Monger, the wholesale man, came to Milwaukee for the purpose of checking up on the sales, and, upon receiving Morris F. Fox & Company's complaint about the difficulty in getting additional bonds, said that he would make arrangements to get them all the bonds they wanted but that they would have to come through Dahinden-Schmitz Company. Morris F. Fox & Company thereafter purchased $85,000 worth of additional bonds over a period beginning October 21st and ending December 1st. All of these were purchased through Dahinden-Schmitz Company. After October 3 and until November 12, 1927, no letters or telegrams passed between Lisman & Company and Morris F. Fox & Company. During the month of September, 1927, arrangements were made by Lisman & Company and their attorneys to secure a listing with the various exchanges, which listing would qualify the sale of bonds in many states without going through the formality of securing Blue Sky permits. Sub. (4), sec. 189.03, of the Wisconsin Statutes provides that its provisions shall not be applicable to securities officially listed upon the New York, Boston, or Chicago stock exchange. On November 14th application was filed

with the Wisconsin Railroad Commission for permission to sell securities under the Wisconsin law, and on December 1, 1927, the Railroad Commission declined to give the bonds a class A rating. Thereafter numerous conferences were had between representatives of the defendants and the officials of the Railroad Commission. On January 4, 1928, in accordance with the selling-group letter, the syndicate distribution was extended for a period of sixty days. On April 2, 1928, Lisman & Company forwarded to Dahinden-Schmitz Company a check for $16,935 on account of their concession on commitment in the banking group up to December 20, 1927. Thereafter Dahinden-Schmitz Company inclosed their check for $6,500.10 in full and final settlement on the Morris F. Fox & Company commitment. On May 15, 1928, the Railroad Commission gave the securities a class B rating. This compelled Morris F. Fox & Company to offer to all purchasers of bonds through it a repurchase of their bonds at the price sold. It is the loss involved in this repurchase and the subsequent resale in a depreciated market that constitutes the damages claimed by Morris F. Fox & Company in this case.

Since this complaint is one for breach of contract against Lisman & Company, plaintiff must establish, first, that there was a contract between plaintiff and the defendant Lisman & Company, and second, that this contract, as one of its conditions or covenants, involved an agreement on the part of Lisman & Company to secure a class A rating for the securities. The evidence tending to substantiate such a contract may be recapitulated as follows: October 1, 1927, telegram to Lisman & Company from Morris F. Fox & Company, ordering twenty-five thousand additional Vending bonds, together with reply telegram accepting the order.. This is followed by a letter of October 3d by Fox, which states that in confirmation of acceptance they are sending a duplicate copy of the selling-group letter, duly executed, the letter

ending with the proviso that the purchase is predicated upon the understanding that the bonds will receive a class A rating. This letter contained a pencil notation by one of defendant's employees: "Mr. Lyon advises Boston listing takes care this—if not we make application direct as reg. dealers this state." The selling-group contract which was inclosed in this letter is signed by F. J. Lisman &. Company, is not specifically addressed, and is in the form of a letter. It describes the terms of the offering, and invites the person to whom it is sent to join the selling group. It provides that delivery of the securities will be made to members of the selling group at the Central Union Trust Company of New York. Lisman & Company are described as "selling-group managers." The invitees are requested to sign an acceptance at the bottom of the letter, which is in the form of a letter to Lisman & Company, and reads:

"The undersigned hereby accepts an interest in the above Selling Group under the terms and conditions therein set forth and makes. application for . . . par value, subject to allotment."

This letter was signed by Morris F. Fox & Company and the blank filled in with the sum of "$125,000." The agreement describes the liability of the selling group as a liability to maintain the list price, to make payment on delivery date for the securities confirmed, and to take up securities repurchased. On October 6th, in accordance with directions from Lisman & Company to notify dealers of their allotment, Dahinden-Schmitz Company wrote Morris F. Fox & Company announcing the amount of their allotment and the amount due. Morris F. Fox & Company made payment to the Central Union Trust Company in accordance with directions, and received the securities direct, Lisman & Company later sending them a check for postage and insurance.

Briefly stated, the contention of the respondent is that since this letter defining the contractual relations of the

selling group with Lisman & Company was sent out by the latter, and since it was signed and returned to them by Morris F. Fox & Company, a contractual relation was entered into directly with Lisman & Company; that the contractual relationship, as defined in the letter, was modified by the letter of transmittal, and the obligation to qualify the bonds as class A securities was thereby imposed; that the selling-group contract as originally executed was to govern all the sales made by members of the selling group, and no new selling-group contracts were contemplated, and hence whatever relations were fixed in the beginning would affect all the sales made by members of the selling group.

There is no difficulty in arriving at the conclusion that negotiations were had between Lisman & Company and the plaintiff. The exchange of telegrams and the subsequent execution of the selling-group letter, which purported to be signed by Lisman & Company and which was thereafter executed by Morris F. Fox & Company, are all indications of at least attempted contractual relations between the two. If it were not for the qualification contained in the letter of transmittal, we would have no difficulty in holding that a contract was entered into between Lisman & Company and the plaintiff. The difficulty is to ascertain the legal effect of the proviso contained in plaintiff's letter of transmittal, to the effect that its purchase was predicated upon the understanding that the bonds would receive a class A rating. This proviso in the letter constituted one of three things, and since, whichever it did constitute, it is our conclusion that plaintiff cannot recover, it is probably unnecessary to decide its precise legal effect. It may have been an offer to enter into a contemporaneous collateral understanding with reference to the listing of the bonds. In the event that it was, we think there was no acceptance, for reasons which will hereafter be discussed. Further than this, if such was its effect, it would constitute an attempt at variance or modifica-

tion of the selling-group contract. The selling-group contract is a complete integration of the relations between the selling group and Lisman & Company.

In paragraph 8 the liability of Lisman & Company is fully set forth in the following language:

"As managers we shall not be liable with respect to the validity or value of the security or the representations contained in, or the form or validity of, any letter, circulars, agreements, or other instruments executed by the corporation or by others, nor for the delivery of the security, nor for the performance by the corporation or others of any agreement on its or their part, nor in any way or for any matter connected herewith except for lack of good faith in performing or failing to perform the undertakings expressly assumed by us by this agreement."

The instrument imposes no such obligation as is contained in the plaintiff's proviso. The only obligation approaching it is in paragraph 7 of the selling-group letter, by the terms of which the managers agree with the members of the selling group to cause to be published a notice respecting the security in the form required by the "Martin Act," and pursuant to the provisions of article 23-A of the General Business Law of the state of New York.

Sec. 359-e of this act, after defining the word "dealer," provides that no dealer shall sell or offer for sale to the public within the state of New York any securities issued or to be issued, unless a notice to be known as the "state notice" containing the name or postoffice address of such dealer shall have been filed in the Department of State. The notice is required to state the name and business address of the dealer, and if a corporation, the state or country of incorporation, and if a partnership, the names of the partners. Sub. 2 provides for a further statement giving the name of the security, postoffice address, and state or country of incorporation of the issuing corporation, and if the persons filing the notices are acting under sub. 3, adding the words "syndicate man-

ager" or "syndicate managers" to their name. Sub. 3 provides that whenever a dealer shall have become a member of a selling group or syndicate formed pursuant to a written agreement for the purpose of effecting the sale or distribution to the public of a particular issue of securities which are not exempted from the provisions of sub. 2 of the section, any member of such syndicate shall be deemed to have complied with the provisions of sub. 2 without the filing of any notice required by such division, if the syndicate manager, at least one of whom maintains an office in the state of New York, shall have agreed with the members of the selling syndicate to cause to be filed a state notice respecting such securities in the form required by sub. 2 of the section. These notices are required to be filed at or before the time the securities are sold or offered for sale to the public, and may be filed either in the name or names of the syndicate manager or managers, or in the name of one of them who maintains an office in this state.

Paragraph 7 of the selling-group letter explicitly sets forth such obligation as the syndicate managers had to qualify the securities, and the scope of their obligation is indicated by the above summary of the New York act. Assuming that the proviso in the letter contemplated a prior or contemporaneous collateral agreement, we think its necessary effect would be to vary or modify the obligations of the syndicate managers as carefully set out in the selling-group contract. Under familiar and elementary rules of law the proviso would not be admissible to vary the writing, and if admitted would not be effective to do so.

If the proviso is treated not as a counter-offer but merely as a statement that plaintiff's acceptance would not be effective until the contingency of class A qualification happened, there would be no rejection of the original offer, but the difficulty from the standpoint of the plaintiff is that there would also be no contract until the securities had been so

qualified as to discharge the contingency which operated to suspend the going into effect of the acceptance. See 1 Williston, Contracts, § 51a.

If the proviso is to be considered as a counter-offer, it amounts to a rejection of the offer, and in the absence of acceptance of the counter-offer there would be no contract. It is elementary that the acceptance of an offer must be unconditional and in accordance with the terms of the offer. *Clark v. Burr,* 85 Wis. 649, 55 N. W. 401; *Mygatt v. Tarbell,* 85 Wis. 457, 55 N. W. 1031.; *Northwestern Iron Co. v. Meade,* 21 Wis. 474; *Russell v. Falls Mfg. Co.* 106 Wis. 329, 82 N. W. 134.

An attempted acceptance of an offer, if coupled with any condition that varies or adds to the offer, is not an acceptance, but a counter-proposition or counter-offer. *Curtis L. & L. Co. v. Interior L. Co.* 137 Wis. 341, 118 N. W. 853; *Helmholz v. Greene,* 173 Wis. 306, 181 N. W. 221; *Hemenway v. Connor L. & L. Co.* 175 Wis. 443, 185 N. W. 524; 1 Page, Contracts, § 169. In such an event there must be an acceptance of the counter-offer in order to complete the contract. 1 Williston, Contracts, § 92; *Jacob Johnson Fish Co. v. Hawley,* 150 Wis. 578, 137 N. W. 773; *Russell v. Falls Mfg. Co.* 106 Wis. 329, 82 N. W. 134. In the latter case it is held that acceptance of a counter-offer can be inferred from any conduct on the offeree's part indicative thereof, but that mere silence bears no such significance.

Assuming, then, that this proviso constituted a counter-offer, was the counter-offer accepted? Certainly it was not expressly accepted. There was no response whatever by Lisman & Company to the letter of plaintiff. There is nothing in the mere act of filing, and we think there is nothing in the notation made upon the letter by defendant's employee, which indicates an assent to this as a counter-proposition. It is of course obvious that these acts constituted no manifestation of assent to the plaintiff. It is stated in 1 Willis-

ton, Contracts, § 91: "Generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer," citing *Grice v. Noble*, 59 Mich. 515, 26 N. W. 688; *Royal Ins. Co. v. Beatty*, 119 Pa. St. 6, 12 Atl. 607, 4 Am. St. Rep. 622; *More v. New York Bowery F. Ins. Co.* 130 N. Y. 537, 29 N. E. 757. See, also, 1 Page, Contracts, § 160. This rule is of course subject to exceptions. If the relations between the parties have been such as to give to silence the significance of an assent to the offer, the offeree's silence may amount to an implied acceptance. *Hobbs v. Massasoit Whip Co.* 158 Mass. 194, 33 N. E. 495. Or, if the conduct of the offeree is such as to lead the offeror to believe that the offer has been accepted, there may be an acceptance by estoppel. 1 Page, Contracts, § 161.

We are unable to discover in the conduct of Lisman & Company any evidence of an intention to accept this proviso, if it was a counter-offer. The indicia of acceptance, as argued by the plaintiff, are that Lisman & Company proceeded to supply the bonds to Morris F. Fox & Company; that they paid the insurance and transportation charges upon the interim certificates; that they made very active efforts to qualify the bonds before the Railroad Commission, and that by their advice the plaintiff sold these securities upon its bond as class A securities. We do not believe that this furnishes evidence of an acceptance by conduct. The significance of the conduct of Lisman & Company with respect to the sale of the bonds must be considered in connection with their relations with Dahinden-Schmitz Company, who had a banking-group participation, and who had solicited the subscription from the plaintiff prior to the transaction in question. The evidence shows that throughout this whole transaction Lisman & Company regarded the sale of bonds in Wisconsin as having been made through Dahinden-Schmitz Company, and considered that Dahinden-Schmitz Company

was entitled to credit upon its banking-group commitment for all sales made at its solicitation. There is no question under the evidence but that the $125,000 of bonds involved in the Morris F. Fox & Company subscription were credited to Dahinden-Schmitz Company upon their commitment. Neither is there any question but that Lisman & Company regarded the sale of these bonds as a sale to Dahinden-Schmitz Company. By letter of October 5, 1927, to Dahinden-Schmitz Company, Lisman & Company states: "We are pleased to confirm sale *to you,* if, as, and when issued, of $350,000 par value bonds at 98½ and interest," etc. The amount stated included the amount of the plaintiff's subscription. While the letters and correspondence generally, indicating that Lisman & Company treated the sale of these bonds as a sale to Dahinden-Schmitz Company rather than to Morris F. Fox & Company, may have no independent legal effect, and may not in any way impair a contention that the bonds were ultimately sold by Lisman & Company to Morris F. Fox & Company, we think they furnish no evidence of an intention to accept plaintiff's counter-offer. They were communications with Dahinden-Schmitz Company, and are clearly in response to the relations between Lisman & Company and Dahinden-Schmitz Company. The only document which could be argued to constitute a response to plaintiff's letter containing the proviso was sent by Dahinden-Schmitz Company, and this purported to be an acceptance according to the terms of the selling-group contract and made no reference to the counter-offer.

Did the fact that Lisman & Company made efforts to qualify these bonds indicate such a response and acquiescence to plaintiff's counter-offer as to constitute objective evidence of assent? The evidence shows that on November 10, 1927, the Railroad Commission called plaintiff's attention to the fact that under date of October 3d the commission had been notified that plaintiff intended to sell General Vending secu-

rities under the privilege of its surety bond, and that it was then stated that Lisman & Company would qualify the bonds. Plaintiff was further informed that no application had been received, and that it was past due. Following this, on the 11th of November, a telegram from Dahinden-Schmitz Company to Lisman & Company advised them of the contents of the letter of the Railroad Commission. On the same day Lisman & Company wired Dahinden-Schmitz Company requesting them to advise the commission that lawyers were rushing the necessary papers. On the 12th of November, 1927, the plaintiff also wired to Lisman & Company advising them of the Railroad Commission's communication and asking Lisman & Company "what are you going to do about it?" In response to this Lisman & Company wired plaintiff that lawyers were working on the papers and would forward them "tonight or Monday." The papers were forwarded on the 16th of November, as indicated by a letter from Lisman & Company to Morris F. Fox & Company, stating that their attorneys had mailed the application to the Railroad Commission. On the 16th of November there was a telegram from Morris F. Fox & Company to Lisman & Company requesting information as to the present status of the application to the Wisconsin commission, to which Lisman & Company wired plaintiff on the 17th stating that the application was before the commission. On December 5th, in response to notification that the Railroad Commission had declined class A rating for the bonds, Lisman & Company wired Morris F. Fox & Company stating that they were in the process of obtaining further figures to be submitted to the commission, and on the 6th of December a telegram from Lisman & Company to Dahinden-Schmitz Company asked them to await developments, and that extra data were being gathered with which to induce the commission to grant a class A rating. On December 6th plaintiff wired Lisman & Company giving in detail the respects in which the applica-

tion was defective, and making suggestions for a further showing. On December 7, 1927, Lisman & Company wired in reply that everything suggested in plaintiff's wire was already being done.

These communications indicate plainly enough that Lisman & Company were making efforts to qualify the securities, and that they were co-operating with both Morris F. Fox & Company and Dahinden-Schmitz Company to get them qualified. Is it also a permissible inference that the conduct of Lisman & Company in so doing constituted an acceptance of the proviso? It is our conclusion that such an inference is not permissible. In a letter of September 15, 1927, sometime before the transaction contained in the proviso, Lisman & Company announced that arrangements were being made to "Blue Sky these bonds in your state." Hence the project of securing the approval of the Railroad Commission was evidently not undertaken as an implied acceptance of the proviso contained in plaintiff's letter of October 3d, but was a project which was in the mind of Lisman & Company, probably for ordinary commercial reasons, prior to the transaction in question. Under these circumstances we think it cannot be given significance as an implied acceptance of the counter-offer.

The next question is as to whether there is anything in the conduct of Lisman & Company which might have led plaintiff reasonably to conclude that the counter-offer had been accepted, and so to act upon that assumption as to estop Lisman & Company to deny acceptance of the counter-offer. In 1 Page, Contracts, § 161, it is said:

"A.'s conduct, of which his silence is a part, may be such as to lead B. to believe that A. has accepted B.'s offer. Under such circumstances A.'s silence may amount to consent. If a counter-offer as to the form of the contract is received by the original offeror with silence under circumstances which indicate his acquiescence in such counter-offer, such silence may amount to acceptance."

On October 11, 1927, Dahinden-Schmitz Company sent Morris F. Fox & Company a letter stating that Dahinden-Schmitz Company had received notice from Lisman & Company that they had filed preliminary notice with the Railroad Commission so as to make it necessary to offer the bonds as class A securities under the bond of the recipient with the Railroad Commission. From this it may be argued that the conduct of Lisman & Company induced the plaintiff to offer the bonds as class A securities under their bond, and to incur the consequent liability to repurchase in case the securities failed to receive this classification. However, it also appears from the letter of the Railroad Commission dated November 10th that plaintiff, on October 3d, several days before this notice and before any sort of representations were made upon which they could rely, had notified the Railroad Commission that they intended to sell these securities under the privilege of their surety bond, and that Lisman & Company would qualify them. We are unable to discover any basis for an estoppel in the acts of Lisman & Company up to October 3d, and since the plaintiff elected to sell them as class A securities under their bond upon that date, we find it impossible to conclude that they relied in so doing upon the subsequent conduct of Lisman & Company.

The further contention is made on the part of the respondent that Lisman & Company entered into an agreement with Dahinden-Schmitz Company for the benefit not only of the latter but of all brokers in Wisconsin, that it would take whatever action might be necessary either to render the bonds exempt from the provisions of the Wisconsin securities law or to qualify them as class A securities. We are unable to find any support in the evidence for this conclusion. On September 15th Lisman & Company wrote Dahinden-Schmitz Company stating "we are now making arrangements to Blue Sky these bonds in your state." There is further correspondence, and there are conversations indicating that

Lisman & Company were making efforts either to so list the bonds as to make them exempt from the provisions of the Wisconsin act, or to qualify them under the Wisconsin act. We find no evidence therein of a recognition that Lisman & Company was under a contractual duty so to do, and if there were such a contractual duty we find no evidence of any undertaking to secure a class A qualification.

. The next contention of the respondent is that the sales made to Morris F. Fox & Company contemplated a resale by the latter within the state of Wisconsin, and that there was an implied warranty that the bonds were such as could properly be given a class A rating. We think this contention is without merit. Assuming that the Uniform Sales Act applies to such a sale as this, or that if it does not it is merely declaratory of a common-law rule imposing an implied warranty of merchantability in such a situation, we are satisfied that the warranty so implied would not be as extensive as would be necessary to sustain plaintiff's right to recovery. It could not be contended to be broad enough to warrant that the securities had the necessary qualities to secure a class A rating. The most that could be contended would be that there was a warranty that the bonds could qualify for sale in Wisconsin. That these bonds could and did so qualify for sale in this state is sufficiently established by their ultimate class B rating.

In view of the above conclusions, it is unnecessary to consider appellants' objection to the basis upon which damages were assessed. Nor do we consider it necessary to consider the admissibility of the telegram from Lisman & Company to Morris F. Fox & Company of October 3d, instructing them that their wants would be supplied through Dahinden-Schmitz Company. While the inferences from this telegram, if actually sent, may tend somewhat to fortify the conclusions which we have reached, it was sent before the receipt of plaintiff's counter-proposal and can furnish little

assistance in determining whether Lisman & Company assented to the counter-proposal.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.

The following opinions were filed February 9, 1932:

FOWLER, J. A motion for rehearing is filed herein. Upon reconsideration we are of opinion that our original mandate must be vacated and the judgment affirmed upon the ground that the trial court's finding that a contract was entered into between plaintiff and defendant Lisman & Company whereby Lisman & Company agreed in effect that it would procure a class A rating of the bonds by the Wisconsin Railroad Commission is sufficiently supported by the evidence and must be upheld. This rules the case in favor of the plaintiff.

The main evidentiary facts are well and fully stated in the original opinion and no further statement of them will be made here except as seems advisable to make clear the reasons for our change of view.

It is stated in the opinion heretofore filed that "there is no difficulty in arriving at the conclusion that negotiations were had between Lisman & Company and the plaintiff. . . . Exchange of telegrams and subsequent execution of the selling-group letter which purported to be signed by Lisman & Company and which was thereafter executed by Morris F. Fox & Company, are all indications of at least attempted contractual relations between the two. If it were not for the qualification contained in the letter of transmittal we would have no difficulty in holding that a contract was entered into between Lisman & Company and the plaintiff. The difficulty is to ascertain the legal effect of the proviso contained in plaintiff's letter of transmittal to the effect that its (plaintiff's) purchase was predicated upon the understanding that the bonds would receive a class A rating."

The plaintiff on October 3d signed the selling-group contract above referred to and thereby applied for bonds of $125,000 par value, and inclosed it in a letter saying: "This purchase is of course predicated upon the understanding that an application will be filed with the Railroad Commission of Wisconsin for these bonds and that they will receive a class A rating." This quotation constitutes what is referred to as the "proviso" in the above quotation from the opinion. This letter was received by Lisman & Company and referred to Lyon, their "office expert on Blue Sky matters," and the notation was indorsed thereon "Mr. Lyon advises Boston rating takes care of this—if not we make application direct as reg. dealers," and the letter thus indorsed was filed by Lisman & Company with the accompanying selling contract. This letter was written "In confirmation of our (plaintiff's) acceptance of an interest of $125,000 par value in the selling group." Plaintiff had previously orally promised Dahinden-Schmitz Company to take $76,000 of the bonds and had wired Lisman & Company for $25,000 additional bonds, and Lisman & Company had by wire direct to plaintiff accepted its request for $25,000 additional and offered it another $25,000. With its letter and signed selling-group contract the plaintiff inclosed its regular form of confirmation of order, confirming its $125,000 purchase. Plaintiff on the day it sent these inclosures to Lisman & Company made out its order card for the $125,000 of bonds with terms of purchase and net price stated, designating the purchase as from Lisman & Company, giving the date of expiration of the selling group, and closing with the statement, "Must be qualified." Selling-group members had direct contractual relations with Lisman & Company. The oral promise to take $76,000 of bonds was of that amount to bring plaintiff into the four per cent. concession to selling-group members who took that amount and over, and the $125,000 purchase was made up of the $76,000 and two $25,000 items, the

extra $1,000 being dropped as not necessary to bring plaintiff into the four per cent. concession to the selling group.

A copy of the plaintiff's letter to Lisman & Company accompanying the signed contract was sent to Dahinden-Schmitz Company on October 3d so that the latter were informed of the "proviso" attached to the $125,000 purchase. Lisman & Company had wired Dahinden-Schmitz Company that it would protect them on the $50,000 additional orders given by plaintiff. Lisman & Company did not reply direct to plaintiff on receipt of the letter and inclosures, but on October 3d Dahinden-Schmitz Company wrote a letter to plaintiff confirming the sale to it of $125,000 subject to the terms of the selling group, but making no reference to the "proviso" attached to the plaintiff's subscription, which was signed Dahinden-Schmitz Company "for F. J. Lisman & Company and B. J. Van Ingen Co." On October 6th Dahinden-Schmitz Company wrote plaintiff stating that it was writing "in behalf of Lisman & Company" and that payment would be due on October 10th, "against delivery" of its $125,000 purchase, specifying the place of payment. The plaintiff made payment as directed and Lisman & Company delivered interim certificates for the bonds through the mails direct to plaintiff on receipt of the remittance.

The letter and the signed agreement were signed and transmitted by the plaintiff at the same time and the two together with the order of confirmation constituted a single transaction. Lisman & Company had offered to sell bonds to plaintiff on the conditions stated in its signed agreement. The plaintiff signed this agreement but on the stipulated "understanding of course" that Lisman & Company would procure class A rating. Signing the selling-group contract in connection with this expressed stipulation did not constitute an acceptance by the plaintiff of Lisman & Company's offer, but the expressed stipulation constituted, as the trial court concluded, a counter-offer by the plaintiff which Lis-

man & Company had to accept before a contract would be created. Lisman & Company did not themselves expressly accept this counter-offer, but, as the opinion heretofore filed herein shows, acceptance may result from conduct as well as from express words. Mere silence does not constitute acceptance, but Lisman & Company's conduct was much more than mere silence. They consulted their Blue Sky expert and made a notation on the letter indicating or supporting the inference that they accepted the plaintiff's offer to purchase on the condition imposed by it. They accepted plaintiff's money for the bonds it purchased and sent to it as directed, and delivered the bonds directly to the plaintiff. They took steps to procure the rating upon which plaintiff's offer was conditioned and pressed their application to final action by the commission. If Lisman & Company did not accept the counter-offer of plaintiff no contract existed between them. If a contract did exist, it was the contract created by plaintiff's counter-offer and its acceptance. The subsequent conduct of Lisman & Company is held to justify the conclusion of fact drawn by the trial judge, which cannot be rejected unless it is against the preponderance of the evidence. Moreover, the trial court found, and the facts above stated with many others too numerous to mention contained in the 440 pages of the printed case and 70 of the supplemental case, amply support the finding, that Dahinden-Schmitz Company acted as the agent of Lisman & Company in their transactions with the plaintiff. Dahinden-Schmitz Company expressly confirmed plaintiff's purchase even though they did not in their letter of confirmation refer to the condition imposed upon the proposed purchase. They could not confirm the purchase without impliedly accepting the condition on which the proposition of purchase was based. This letter of confirmation was signed, "Dahinden-Schmitz Company, by Geo. J. Schmitz, Vice-President, *for* F. J. Lisman & Company;" and the letter from Dahinden-Schmitz

Company to the plaintiff informing it when the bonds would be delivered and how and where to remit contained the statement, "We desire to advise you on behalf of F. J. Lisman & Company."

The trial court's finding of the existence of the contract being upheld, it supports the judgment, unless plaintiff's counter-offer should be construed as meaning that the plaintiff would not take the bonds until the class A rating should be procured. But such was clearly not its meaning. The bonds were purchased by the plaintiff and all other purchasers under the selling-group agreement for sale to customers, and both parties understood that the bonds purchased by plaintiff would be sold by it immediately. Lisman & Company had advertised the bonds as going on the market on October 4th. The time of delivery to all was fixed as when payment was made and all purchasers were notified that the time of payment was fixed as October 10th. Obviously plaintiff could not sell the bonds purchased unless it offered them to its customers simultaneously with other brokers. Application for a rating by the Railroad Commission had not been made when the bonds were purchased, and obviously a rating could not be procured until long after the bonds were contemplated by the parties to be sold. Moreover, the payment for and delivery of the bonds forthwith shows that it was not intended that delivery should await procurement of the rating. This constituted a practical construction by the parties that delivery of the bonds should not be delayed until the rating was procured. The stipulation of the counter-offer was that Lisman & Company should make application to the Wisconsin Railroad Commission for and should procure a class A rating. It was known to both parties that under the Wisconsin Blue Sky Law, as listing on the New York, Boston, or Chicago stock exchanges had not been procured, that the plaintiff could not sell the bonds at all unless such application were made. Hence it was to be expected

that Lisman & Company would make such application and it was reasonable for the plaintiff to impose as a condition of such purchase that such application should be made. It was also known to both parties that as a listing on none of the stock exchanges mentioned had been procured, a binding sale of the bonds could not be made by the plaintiff under the Wisconsin Blue Sky Law unless a class A rating by the Wisconsin Railroad Commission should be procured. It was known to both that unless such listing or classification were procured the plaintiff would be obliged under the Wisconsin Blue Sky Law to take back bonds sold by it and refund the purchase price on demand therefor. And absolute sales, not sales that were subject to revocation or rescission at the option of the purchaser, were contemplated by the parties. It was not only reasonable of the plaintiff to require protection against this contingency, but it was reasonable for defendant to provide it. It is not only proper to consider all this in determining the meaning of the contract between the plaintiff and Lisman & Company, but it was proper for the trial court to consider it in determining whether the contract as found was made. And it should also be stated that many facts other than those above stated appear from the record that tend to support the trial court's conclusion that the contract found was made.

It is urged in the original brief that if the trial court was right in finding the contract was made as claimed by plaintiff, the contract did not cover the $85,000 of bonds purchased by plaintiff subsequent to the original purchase of $125,000. The additional bonds were purchased in five lots of $10,000, $10,000, $30,000, $20,000, and $15,000. They were purchased through Dahinden-Schmitz Company, but we consider, as the trial court found, that Dahinden-Schmitz Company was acting as the agent of Lisman & Company in these purchases. In every case on receiving request from plaintiff for bonds Dahinden-Schmitz Company wired inquiry to Lis-

man & Company whether they could be furnished. The first order for $10,000 was given on the solicitation of Monger, who was sent by Lisman & Company from their New York office to assist in selling the bonds still in the hands of Lisman & Company and who negotiated directly with the plaintiff, and on his representation that Lisman & Company could furnish additional bonds as required by the plaintiff. Monger himself wired Lisman & Company for the first $10,000 ordered by plaintiff. All the subsequent orders are readily referable to Monger's original direct solicitation and representation. Prior thereto plaintiff, on running out of bonds desired, had purchased them from another Milwaukee broker. Monger in soliciting orders for Lisman & Company operated from Dahinden-Schmitz Company's office. The later orders went through Dahinden-Schmitz Company to increase their participation as a banking-group member. Confirmations by Dahinden-Schmitz Company to plaintiff of the $30,000, $20,000, and $15,000 orders contained the notation: "Bonds delivered at selling-group terms." Confirmation of the second $10,000 order contained the words "delivered regular." The purchase price of all five of the lots was computed and paid on the basis of the selling-group contract. While Lisman & Company sent the bonds to Dahinden-Schmitz Company with draft attached, Dahinden-Schmitz Company did not pay the draft until they had collected from the plaintiff. Much more evidence might be detailed tending to support the trial judge's finding that these purchases were made under the plaintiff's selling-group contract with Lisman & Company. We consider that his finding is supported by the evidence and must be upheld.

Appellants assign as error that the trial court erred in refusing to receive in evidence a certain telegram. The trial judge refers to this telegram in his written decision and states that whether it be received or rejected it would not affect his finding. It seems to us plain that this exhibit,

merely one of nearly 300, is of no such import or importance as to affect in any way the final result. The refusal to receive it, if it was error, was in no way prejudicial.

It is lastly claimed by appellants that the trial court erred in fixing the measure of damages. The plaintiff demanded of Lisman & Company that they take back the bonds it was compelled to take back from its customers on their demand at the selling price to its customers which it had been compelled to refund. On Lisman & Company's refusal to comply with this demand the plaintiff notified them that it could not afford to keep the money it had paid for the bonds tied up and would be compelled to liquidate its damages by sale on the open market, which it proceeded to do. The trial judge in his written decision stated the measure of damages as the difference between what the plaintiff received on so selling and "the agreed fixed price of $98\frac{1}{2}$ per 100 par value, with interest in each instance, from the date of sales as established." The bonds were sold by plaintiff to its customers at $98\frac{1}{2}$, and that amount, with interest, was the amount which it was required under the Blue Sky Law to refund. The damages were computed on the basis fixed by the trial judge.

While the Uniform Sales Act does not apply to sales of bonds, as they are not "goods" within the definition of that term in the act, it would seem by analogy to offer a method by which plaintiff might reasonably proceed to liquidate its damages. The course to pursue in case of rescission of a sale of bonds and refusal to accept return would under ordinary circumstances doubtless be to retain the bonds and tender them into court and recover the amount paid for them with interest. But the plaintiff could not afford to keep the large sum of money it had invested in the bonds tied up. To have done so would have worked a hardship on the plaintiff likely to lead to resulting injury for which it might not be entitled to compensation by way of damages, and the amount of

which compensation, if it were entitled to it, would be difficult or impossible to estimate. And liquidation by resale was doubtless more advantageous to defendant than retaining the bonds would have been. It doubtless minimized the damages. The defendant in fact claims that plaintiff should have liquidated the damages by sale of the bonds, but that it should have resold them promptly on their return and required their return within thirty days after the denial of the class A rating, as it might have done by giving the thirty-day Blue Sky Law notice immediately upon the denial. Sec. 189.22 (2.), Stats. Assuming that liquidation of damages was proper and that sale was a proper method of liquidation, we see no better way to sell than according to the provisions of the Uniform Sales Act. If the method there provided is fair to the parties in the sale of goods, we see no reason why it is not a fair method of liquidating damages on a sale of bonds in case of rescission where liquidation is more just than holding the bonds to tender in court.

By the Uniform Sales Act, if a seller has promised that a condition shall be performed the buyer may treat non-performance as a breach of warranty. Sec. 121.11 (1). Where there is a breach of warranty the buyer may rescind the sale, and if the goods have been received he may return or offer to return them and recover the price paid. Sec. 121.69 (1) (d). Under sec. 121.69 (5) if the seller refuses to accept the goods the buyer has the remedies provided by sec. 121.53 for an unpaid seller, among which is the right of resale as limited by the act. Sec. 121.53 (1) (c). In reselling the seller's obligation is "to exercise reasonable care and judgment in making a resale," and he may "make a resale either by public or private sale." Sec. 121.60 (5).

The plaintiff, whether intentionally or not, followed the course pointed out by these provisions. The trial judge found that by selling upon the open market the plaintiff exercised "due and proper care in placing the same (bonds)

on the market so as to obtain the best price obtainable." The amount in each instance at which the plaintiff sold the bonds to its customers and the amount it refunded to them, disregarding interest, was the amount which it paid Lisman & Company for them. We consider that the rule applied by the trial judge was proper under the circumstances existing.

As to defendant's claim that the plaintiff should have given the thirty-day notice provided by the Blue Sky Law immediately after the order denying the class A rating was entered, it may be said as having some bearing that the defendant's conduct was such as to tend to deter the plaintiff from taking that course until as late as August 12th; that the defendant's right to bring court action to vacate the rating order did not expire until August 13th; that the efforts of plaintiff and its counsel to get an adjustment continued to as late as September 28th; and that the defendant's denial of liability on advice of counsel did not occur until that date. But it is deemed sufficient to say upon this point that the trial court's finding that the plaintiff acted with due care in its resale of the bonds returned seems to us to meet this contention. We consider that this finding is supported by the evidence.

The propositions raised by the motion for rehearing are so fully treated in the briefs of counsel that reargument and further briefs are considered unnecessary. The motion for rehearing will therefore be denied.

*By the Court.*—The motion for rehearing is denied, without costs. The original mandate filed herein is vacated and the judgment of the circuit court is affirmed.

WICKHEM, J. (*dissenting on rehearing*). There is probably no great profit in an extensive restatement of my views concerning this case. As it still appears to me, there is no evidence in the record indicating an acceptance of plaintiff's counter-offer. Certainly there was no express acceptance unless the letter of October 3d, by Dahinden-Schmitz Company, be held to constitute such an acceptance. This letter,

written in Milwaukee, was of even date with the letter of plaintiff, which contained the counter-proposal and which was addressed to F. J. Lisman & Company in New York. Whether the Dahinden-Schmitz Company is to be treated in any sense as agents for F. J. Lisman & Company, I think it cannot be said that it was clothed by Lisman & Company either with actual or apparent authority to modify the terms of the selling-group contract. Even if it had such authority, or the appearance of it, the offer was not sent to it for acceptance and it was not the offeree. To hold that this letter could operate as an acceptance would seem to me to violate fundamental principles of agency and contracts. No telegraphic information sent by Lisman & Company to Dahinden-Schmitz Company prior to the time when Lisman & Company received the counter-proposal could be construed to confer any new authority upon Dahinden-Schmitz Company with respect to the counter-proposal, since obviously Lisman & Company knew nothing of the counter-proposal at that time.

As to the conduct of Lisman & Company, which is relied upon as evidencing an acceptance, I direct attention to the fact that the conduct of Lisman & Company with respect to plaintiff, during any of the period when such conduct might have the significance of acceptance, did not vary in a single particular from its conduct with reference to other brokers who were operating through Dahinden-Schmitz Company. It did nothing that it would not have done, and would not have been obligated to do, in response to its relations to Dahinden-Schmitz Company. In answer to this it may be said that, its conduct being consistent either with an intention to accept or with an intention to discharge its obligations to Dahinden-Schmitz Company, there is a question of fact arising from the conflicting inferences, and the conclusion of the trial court must therefore not be disturbed. However, I think the record presents rather the situation where a choice between possible inferences can only be made

by speculation and conjecture. *Prelipp v. Prelipp*, 203 Wis. 488, 234 N. W. 730.

For the foregoing reasons I respectfully dissent from the conclusions of the court. I am authorized to say that Mr. Chief Justice ROSENBERRY and Mr. Justice FRITZ concur in this dissent.

The following memorandum was filed May 10, 1932:

PER CURIAM. After denial of the respondent's motion for rehearing, the appellants moved for a rehearing on the question of the measure of damages applied by the trial court. For the reasons stated on denial of a second motion for rehearing in the case of *Tomberlin v. Chicago, St. P., M. & O. R. Co.*, filed herewith (*post*, pp. 30, 36–39, 242 N. W. 677), the motion is dismissed with $25 costs.