S. T. EDWARDS & COMPANY, INC., Respondent, vs. SHAW-
ANO MILK PRODUCTS COMPANY, Appellant.

*February 9—May 9, 1933.*

*Matthew M. Wallrich* of Shawano, for the appellant.

For the respondent there were briefs by *Olen & Olen* of Clintonville, attorneys, and *Alfred J. Parker* of Chicago, Illinois, of counsel, and oral argument by *Mr. Parker*.

The following opinion was filed March 7, 1933:

NELSON, J. The defendant contends (1) that the negotiations, which were conducted by letters, telegrams, and conversations over the long-distance telephone relative to the sale of one thousand bags of milk powder to the plaintiff, never ripened into a contract, and (2) that, even if such negotiations did ripen into a contract, the plaintiff sustained no damages as a result of the asserted breach of contract. In the view we take of this action only the first contention need be considered.

No formal contract, signed by the parties, was entered into. It is conceded by both parties that if a contract was in fact entered into such contract is contained in letters and telegrams which passed between the parties. No dispute exists as to the contents of the letters and telegrams or as to their having been sent and received in regular course. So we have

simply to determine whether a contract resulted from the letters and telegrams.

The trial court was of the opinion that a contract was entered into on July 17, 1931, and that whatever the plaintiff wrote or telegraphed thereafter was simply to express its expectation that the terms of the contract would be fully complied with.

This controversy is governed by sec. 121.04 (1), Stats. That subsection is as follows:

"A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

It is undoubtedly the law that a formal memorandum complete in one writing is not required in order to bind a party.

"It is not necessary that the memorandum should be formal, or in one writing or paper, or made directly between the parties to the contract." *Singleton v. Hill,* 91 Wis. 51, 64 N. W. 588.

"It is not necessary in order to take the contract of sale out of the statute of frauds that there be a formal written contract, nor is it necessary that the written memorandum be complete in one writing. . . . It is well established that a complete contract, binding under the statute of frauds, may be gathered from letters, writings, and telegrams between the parties relating to the subject matter of the contract and so connected with each other .that they may be fairly said to constitute one paper relating to the contract, though only one of the writings may be signed by the party to be charged." *Western Metals Co. v. Hartman I. M. Co.* 303 Ill. 479, 135 N. E. 744.

However, it must appear from the several writings, without resorting to parol evidence, what the contract is. 2 Page, Contracts, § 1348.

The material facts are not in serious dispute. The plaintiff is an Illinois corporation engaged at the city of Chicago in the business of buying and selling dried butter milk and dried skimmed milk. The defendant is a Wisconsin corporation engaged in the business of manufacturing dairy products, including dried skimmed milk, at the city of Shawano. Prior to July 11, 1931, the parties had transacted no business with each other and were in fact strangers. On or before July 11, 1931, the defendant had on hand a considerable quantity of dried skimmed milk. It was desirous of finding a market for the same. Under date of July 11th it mailed to plaintiff the following letter:

"We are manufacturing Roller Process dry skim milk and have on hand at this time a considerable amount of powder which we would very much like to move. We could make immediate shipment of at least a carload. You have been referred to us as a firm that would probably either buy or sell this powder for us. Will you inform us at your earliest convenience whether you can move the powder for us, and at about what price?

"Thanking you in advance for any consideration you may be able to give us, we are," . . .

In response to that letter plaintiff wired defendant on July 14th as follows: "Relet can move dried skim milk two cents per pound. If interested, wire." On the same day defendant wired the plaintiff: "Answering will price quoted net us two cents per pound."

A conversation over the telephone was evidently had between Mr. Edwards, president of the plaintiff, and Mr. Mitton, president of the defendant, on either the 15th or 16th of July. Evidence as to this conversation was received. Mr. Edwards testified that he informed the defendant that the price theretofore mentioned in the telegram was net f. o. b.

Shawano and that Mr. Mitton informed him that the product on hand was "first class." A sample was evidently requested by Mr. Edwards. There was a sharp dispute as to the purpose sought to be subserved by sending a sample. Mr. Edwards maintained that he requested the sample for the purpose of determining its quality. Mr. Mitton testified that it was furnished only for the purpose of showing the size of the meshes of the screens used in its manufacture. In view of the provisions of sec. 121.04 (1), hereinbefore recited, we think the oral conversations were improperly considered as proof that the defendant had offered to sell dried skimmed milk of "first quality."

On July 16th defendant wired plaintiff as follows: "Can ship thousand bags powder send shipping directions."

July 17th plaintiff wired the defendant as follows:

"Accept thousand bags dried skimmed milk first quality hundred pound plain sacks paper lined two dollars net your station rush sample will mail directions and complete order bill lading Monday make sure you get two large cars to hold five hundred sacks each."

The trial court was of the opinion that the telegram of July 17th, just quoted, amounted to an unqualified acceptance of defendant's offer and completed the contract between the parties. It is quite obvious that the court's conclusion is erroneous. A careful consideration of the letters and telegrams hereinbefore recited reveals no memorandum signed by the defendant in which it offered for sale or agreed to sell one thousand bags of "first quality" dried skimmed milk. The plaintiff, therefore, so far as the writings are concerned, introduced into the negotiations a specification that the dried skimmed milk should be of "first quality." It is very clear that this purported acceptance which added a qualification amounted to a counter offer.

"A reply to an offer, though purporting to accept it, which adds qualifications or requires performance of condi-

tions, is not an acceptance but is a counter offer." Restatement of the Law of Contracts, American Law Institute, § 60.

"An attempted acceptance of an offer, if coupled with any condition that varies or adds to the offer, is not an acceptance but a counter proposition or counter offer. . . . In such an event there must be an acceptance of the counter offer in order to complete the contract." *Morris F. Fox & Co. v. Lisman,* 208 Wis. 1, 237 N. W. 267, 271, 240 N. W. 809, 242 N. W. 679; 1 Page, Contracts, § 184.

In addition to the counter offer which this telegram contained, it is quite apparent that the plaintiff did not intend that that telegram should close the contract, for it contained a request to rush sample and stated that "directions and completed order" would be mailed Monday. This conclusion is strongly fortified by plaintiff's letter to the defendant bearing date July 18th:

"We are inclosing further confirmation and two bills of lading, made out complete, for the shipment of 1,000 plain paper lined bags of skimmed milk powder.

"The sample has not been received up to noon today, and there are no more mail deliveries, so we will not have it before Monday morning, but we thought it best to send through the orders with the bills of lading, so you would have them and arrange for two (2) large cars that will hold the 500 bags. Just as soon as we receive the sample, we will wire you whether or not the sample is O. K.

"These two (2) cars are going to one of our best creameries in New York state, who have done lots of shipping for us and make a fine product, and they have ordered us to ship this to help them fill their local orders. We are handling this on extremely close margin to help them out, as they have helped us out many times.

"We are very anxious that you be sure the product is O. K. We would rather you would not try to ship it if it is not the first quality and free from lumps.

"Please make draft on us according to directions, for half of the amount due you on each car as soon as each is shipped, and the minute they are checked in and weighed,

we will receive a report and will mail you our check for the balance."

If the letter just recited was intended by the plaintiff as a confirmation of the acceptance of defendant's offer to sell, it clearly amounted to a counter offer, as a new specification was introduced, viz.: that the product should be "free from lumps." It also sought to introduce terms as to payments which were, according to the undisputed evidence, not in accord with the customary terms relating to payment for carload lots of milk powder. The record is barren of any memorandum signed by the defendant, the party sought to be charged, offering to sell "first quality" dried skimmed milk or "first quality dried skimmed milk free from lumps," or accepting plaintiff's counter offer as to quality and terms of payment. Quite the contrary appears, for on July 24th defendant wrote the plaintiff as follows:

"This is to acknowledge receipt of your letters and your wire of last night, asking for information on shipment of powder.

"We note from the fourth paragraph of your letter of July 18th, which reads in part: 'We would rather you would not try to ship it if it is not the first quality and free from lumps.' In storing this powder in the warehouse, we had some powder which was lumpy, and upon close examination we found that the powder which was free from lumps and the powder which was lumpy was piled together so that it was almost impossible to separate it. Therefore, we thought it best not to ship this powder to you, thinking it might bring you some difficulty. This accounts for our not making the shipments at this time."

Some negotiations were had thereafter which are not material to this controversy, but it appears that on July 28th plaintiff wrote the defendant a letter in which, among other things, it said: "We appreciate the fact that you did not ship the goods when it was so hard and caked but it does ball things up not to have anything."

We think, under the disputed testimony revealed in the correspondence and telegrams, that no contract enforceable under sec. 121.04 (1) was proven. The trial court seems to have lost sight of the fact that the statute provides that a contract to sell goods of the value of $50 shall not be enforceable by action unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or its agent, and seems to have thought that the telephone conversations could supply terms not found in the letters and telegrams. Since the counter offers of the plaintiff were not accepted by the defendant, the negotiations never ripened into an enforceable contract. The court erred in finding that an enforceable contract was entered into.

*By the Court.*—Judgment reversed, with directions to dismiss the complaint.

A motion for a rehearing was denied, with $25 costs, on May 9, 1933.