167 So.2d 126

**The BRUNSWICK CORPORATION et al.**

**v.**

**Robert Dare SITTASON, Jr., et al.**

**8 Div. 114.**

Supreme Court of Alabama.

May 21, 1964.

Rehearing Denied Sept. 10, 1964.

Peach, Caddell & Shanks and Robt. H. Harris, Decatur, for appellants.

Calvin, Gilchrist & Murphree, Decatur, for appellees.

SIMPSON, Justice.

The dissenting opinion of Mr. Justice Harwood contains a full statement of the facts which should be referred to in connection with a study of this opinion.

The dissenting opinion concludes that the Brunswick Corporation had within the

State of Alabama a "soliciting agent"; that said agent took an order from one Dr. Sittason for bowling equipment; that such order provided that to be binding upon Brunswick Corporation it must be accepted by an officer of the company at his home office in Chicago, Illinois; and finally that the "soliciting agent" nor any other agent had authority to make any representations outside of those contained in the order.

So viewed, Mr. Justice Harwood concluded that there was only a question of law involved and that the affirmative charge was due to be given for the Brunswick Corporation, relying on such authorities as Gould v. Cates Chair Company, 147 Ala. 629, 41 So. 675.

Courts throughout the nation have, upon different legal theories, placed exceptions upon the rule as announced in Gould v. Cates Chair Company, supra.

"Apparent Authority". This doctrine holds that the servant's duties may be accompanied by significant appearances. In an appearance of (or ostensible) authority there may be a holding out by the employer; to that may be added a reliance on the authority so appearing; and finally a resulting injury. See Anno. East Coast Freight Lines, Inc., et al. v. Mayor and City Council of Baltimore, 190 Md. 256, 58 A.2d 290, 2 A.L.R.2d 386 (406).

"Estoppel—Implied Acceptance". The Wisconsin Court in speaking to this theory said in Sell v. General Electric Supply Corporation, 227 Wis. 242, 278 N.W. 442:

" ' "Generally speaking an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer," citing Grice v. Noble, 59 Mich. 515, 26 N.W. 688; Royal Ins. Co. v. Beatty, 119 Pa. 6, 12 A. 607, 4 Am.St.Rep. 622; More v. New York Bowery F. Ins. Co., 130 N.Y. 537, 29 N.E. 757. See, also, 1 Page, Contracts, § 160.' Morris F. Fox & Co. v. Lisman, 208 Wis. 1, 13, 237 N.W. 267, 271, 240 N.W. 809, 242 N.W. 679."

In Morris F. Fox & Co. v. Lisman, supra, speaking of the above rule, the Court said:

"This rule is of course subject to exceptions. If the relations between the parties have been such as to give to silence the significance of an assent to the offer, the offeree's silence may amount to an implied acceptance. Hobbs v. Massaoit Whip Co., 158 Mass. 194, 33 N.E. 495. Or, if the conduct of the offeree is such as to lead the offeror to believe that the offer has been accepted, there may be an acceptance by estoppel. 1 Page, Contracts, § 161."

"Prior dealing and relations between parties". In Ammons v. Wilson Co., 176 Miss. 645, 170 So. 227 the Mississippi Court held that a refusal to reject an order after the elapse of only 12 days, a price rise of 7½ cents per pound on shortening, and prior dealing between the parties made up an issue for the jury as to whether or not there was an implied acceptance of the order.

"Delay in Disapproving Order". The Tennessee Court in Cole-McIntyre-Norfleet Co. v. A. S. Holloway, 141 Tenn. 679, 214 S.W. 817, 7 A.L.R. 1683, held that a delay (March 26 to May 26) of a jobber for an unreasonable time to notify a customer of rejection of an order taken by the jobber's traveling salesman amounts to an acceptance of it.

The Supreme Court of Vermont in Hendrickson v. International Harvester Co. of America, 100 Vt. 161, 135 A. 702, held:

"True it is that it takes two to make a bargain, and that silence gives consent in these cases only when there is a duty to speak. Gould v. Cates Chair Co., 147 Ala. 629, 41 So. 675; Senner, etc., Co. v. Gera Mills, 185 App.Div. 562, 173 N.Y.S. 265; Prescott v. Jones, 69 N.H. 305, 41 A. 352; Bowley v. Fuller, 121 Me. 22, 115 A. 466, 467, 24 A.L.R. 964; 13 C.J. 276. And true it is that it is frequently said that one is ordinarily under no obligation to do or say anything concerning a proposition which he does not choose to accept;

yet we think that, when one sends out an agent to solicit orders for his goods, authorizing such agent to take such orders subject to his (the principal's) approval, fair dealing and the exigencies of modern business require us to hold that he shall signify to the customer within a reasonable time from the receipt of the order his rejection of it, or suffer the consequences of having his silence operate as an approval."

See also Sioux Falls Adjustment Co. v. Penn Soo Oil Co., 53 S.D. 77, 220 N.W. 146.

For an interesting observation of the various methods by which principals can be bound by the unauthorized actions of their agents, see "Ratification by Silence", Warren A. Seavey, 103 University of Pennsylvania Law Review, pp. 30–43.

This Court as far back as 1880 realized that a principal is in certain cases under a duty to disaffirm the unauthorized acts of his agent and in Mobile and Montgomery Railway Co. v. Jay, 65 Ala. 113, stated:

"The first head-note in the case of Powell's Adm'r v. Henry, 27 Ala. 612, which holds, that, 'if an agent exceeds his authority, although the principal may ratify the act; yet, to avoid it, he is not obliged to give notice that he repudiates it', is too comprehensive in its statement of the law. It is true that mere knowledge, on the part of the principal, of an agent's unauthorized action, will not make silence, or non-interference, in all cases amount to ratification. But it would, in those cases where the party dealing with the agent is misled or prejudiced (Smith v. Sheeley, 12 Wall. 358, 20 L.Ed. 430); or where the usage of trade requires or fair dealing demands, a prompt reply from the principal."

In Comer & Company v. Way and Edmundson, 107 Ala. 300, 19 So. 966, this Court, upon approving the doctrine set forth in Meyer v. Morgan, 51 Miss. 21, said:

" 'The course of business between the factor [principal] and the correspondents [agents], implies prompt responses to business letters. If the factor advises his correspondents of his acts with respect to his property, and he does not in a reasonable time disaffirm and so notify the agent, the latter may well presume that his conduct has been approved. So large a part of the commerce of the world is done through agents of one sort or another, that it is necessary that this principle should prevail. Hence it is incorporated into all the systems of jurisprudence. Story on Agency, § 258. The principal must disaffirm. Silence will be equivalent to approval. * * * The principal, within a reasonable time, must elect to approve or disapprove the unauthorized act of the agent of which he has been informed. He cannot remain silent and await the vicissitudes of a fluctuating market, and if the price rises, disaffirm and claim the difference; or if it declines, acquiesce in the sale.' "

Hartselle is a relatively small city and there is one fact that is not in dispute in this case, viz.: Brunswick Corporation decided that the city could financially support but one bowling establishment. To say that Grauer, Brunswick's agent, made this decision would certainly arm him with more power and authority than that of a mere order taker. Brunswick Corporation made this decision and their agent busily engaged himself in making this decision known to the two groups involved.

The general rule is that officers and directors of a corporation are chargeable with knowledge of the customs and usages of their corporations. Miles Realty Co. v. Dodson, Tex.Civ.App., 8 S.W.2d 516.

We are not so disturbed with the pronouncement of the law in the dissenting opinion as we are with its interpretation of the facts. A brief review of these is in order. Time plays an important role. It is

apparent that two separate groups of persons desired to establish bowling emporiums in the relatively small city of Hartselle, Alabama and for convenience, these are referred to as the "Sittason" and "Nelson" groups. The "Sittason" group, after preliminary inquiry in December, 1960, first contacted Mr. Kenneth Grauer (salesman for Brunswick) on February 10, 1961. After a night meeting at which the sales agent made his sales talk, gave information as to terms, price, installation, and amount of equipment necessary, this group told Mr. Grauer that they would contact him later, went into executive session and decided to proceed with their plans and to place an order with the Brunswick Corporation for the necessary equipment.

The next day (February 11, 1961), Dr. Sittason contacted Grauer and placed two orders for approximately $150,000.00 worth of bowling equipment and delivered to Mr. Grauer a thousand dollars down-payment on each of the two orders.

The evidence is in dispute as to the actions and statements of Grauer from the period February 10, 1961 to March 22, 1961 in the following matters:

1. Did Grauer or did he not state to the "Sittason" group that if an order was placed with Brunswick that they would deal with no other persons in the Hartselle area for a period of one year?

2. Did Grauer or did he not state to the "Sittason" group after taking the orders that "you are now in the bowling business. Get your land and start building the building"?

3. Did Grauer or did he not state that the city of Hartselle could not support more than one bowling alley?

4. Did Grauer or did he not represent originally (February 10, 1961) that the first group to start erection of a building would be the group that Brunswick would do business with or was such representation made only after the "Nelson" group made its first contact with Grauer on or about March 19, 1961?

5. Did Grauer or did he not state to the "Sittason" group that the approval of the order was perfunctory providing the "Sittason" group were financially responsible?

As stated, "time" seems to play a most important part in the drama. The order placed with Grauer provided that the equipment purchased would be shipped via truck on or about June 1, 1961. Section 10 of the Bowling Lanes Order reads in part: "The seller shall not be required to ship until the premises in which the goods are to be located are suitably lighted, heated and ready for the commencement and uninterrupted performance of work by the seller * * *" The buyer warrants that these conditions will exist on or before *September 1, 1961*. Certainly the terms of this order had no conditions in it which would demand that the purchaser complete its building prior to September 1, 1961.

The "Sittason" group purchased land, secured the architect, and on March 4, 1961, some three weeks after the placing of the order, discovered that the "Nelson" group was contemplating the establishment of a bowling emporium and contacted Grauer with reference to the matter. Grauer exclaimed that he had not been contacted by the "Nelson" group and knew nothing about them, but for the "Sittason" group to proceed with their plans. To paraphrase the earlier western writers, "Meantime, back at the ranch," nothing is being heard of or from the Chicago office, the Memphis office or any other office.

Time marches on—and two weeks later, on March 15, we find the "soliciting agent" Grauer at the building site of the "Sittason" group talking with the architect, furnishing him literature concerning installation and suggestion that the footings for the building be installed as soon as possible.

Four days later, on March 19, Mr. Grauer informed the "Sittason" group that he *"had to talk* with the 'Nelson' group". Just why he had to talk to them is not made clear

from the record, but he informed Sittason that it did not amount to anything and to proceed. Grauer's "had to" talk with the "Nelson" group could not have come from the Memphis office for the manager of that office knew nothing of the "Nelson" group until some time after March 22, 1961.

The "Sittason" group contacted their attorney and on March 22, the attorney called the Memphis office and talked to Mr. John Wackowski, who explained that he was the office manager and according to the attorney's testimony, he told Wackowski the facts and Wackowski replied, "Let me get the file. You have such a contract. I stand behind it; Brunswick stands behind it. We aren't dealing with that kind of people". Mr. Wackowski testified that he was, indeed, the office manager but that his duties and responsibilities were merely clerical. Assuming this to be the limit of his authority, the jury might draw an inference that the order had, indeed, been approved by an officer in the home office of the Brunswick Corporation and that although Wackowski had no authority to approve or disapprove an order, nonetheless, he did have authority to relay such approvals. Mr. Grauer testified that his only authority was to take orders and that he processed both the "Sittason" order and the "Nelson" order in the same manner.

The following excerpt from 3 Am.Jur.2d 718 is apposite to Grauer's testimony:

"On the other hand, when the facts pertaining to the existence or non-existence of an agency are conflicting, or conflicting inferences may be drawn from the evidence, the question presented is one of fact for the jury, or for the court as the trier of fact if the case is tried without a jury. If the weight of such evidence is not full or satisfactory, it is the better practice to submit the question to the trier of fact. Moreover, notwithstanding the alleged principal and agent are the only witnesses called, and they both categorically deny the existence of the relation, the jury have the right to weigh and consider the whole of the evidence and the fair and reasonable inferences that might be drawn therefrom, and they may be entirely justified in disregarding the 'yes or no' answers and in reaching the conclusion that the evidence as a whole is sufficient to prove the relation of agency to exist."

Grauer told the "Nelson" group after being informed that they were ready to proceed, "Not to dispute your word, but we hear this every day and the only way we can tell whether construction is really started is to see visible evidence of it in the ground and from that we can make our decision, but not just on statements, because there are too many of those". And he further testified that he told the "Nelson" group that "I will deal with whoever pours concrete first".

There is only one way to do business with a corporation and that is through its agents, servants and employees. We have the anomalous situation of a mere salesman (who knew his company would deal with only one group) taking two orders of no validity until accepted by the home office— and yet telling the two buyers that the only order to be accepted would be that of the group first commencing its building.

Was this the action of a mere soliciting agent or the furtherance of a stated policy of the Brunswick Corporation? There is no denial by Brunswick that it was untrue or that Brunswick would not and did not accept the fruits of such a policy.

From the foregoing review of the evidence, certainly it would strain the conscience of the average juror or businessman to say that Brunswick's home office, through its agents and employees, did not, in fact, know of the circumstances in this particular case.

The end result, namely the acceptance of the "Nelson" order and the rejection of the "Sittason" order upon the sol~ ground "It would be improper to honor your order as construction has already started on another installation which makes your proposed

operation a poor business risk; we, therefore are arranging cancellation of your order and full return of your deposit", is nothing more or less than an express confirmation of the statements and action of Grauer. Such a course of conduct is sufficient acknowledgment that the Brunswick Corporation was, indeed, well aware of the activities of the agent Grauer and therefore, a participant in the fraud and deceit being practiced upon the "Sittason" group.

■ The dissenting opinion alludes to the fact that custom and usage in a particular case have the burden of proving such usage. But in this fast moving industrial country of ours there is a custom and usage general to all business and that is, business will be conducted with dispatch. The Brunswick Corporation, according to the testimony, does many millions of dollars of business each year and certainly is in a position to approve or disapprove an order within a reasonable time. It should not be allowed through its silence, delay, and reassurances of soliciting agents to lull its prospective customers into a sense of false security, have them expend money, time and effort and then hide behind its corporate structure and soliciting agents and in this manner rake financial damages to its would-be customers.

As stated, the writer finds no fault with the general principles of agency law announced in the dissenting opinion but concludes that under the facts in this case the question of authority of the agent Grauer and the apparent approval of the Brunswick Corporation in his furtherance of their business was properly submitted to the jury.

■ It is well to keep in mind that this is not a suit on a contract. There is no contention on the part of the appellees that the order in this case ever ripened into a contract. The action sounds in deceit and fraud and it is appellee's contention that the Brunswick Corporation ratified, affirmed, or should be estopped by its silence, inaction, and delay from contending that the actions of the agent were limited by the written terms of the order. We would affirm on the theory that a jury could find that the Brunswick Corporation through its silence, undue delay, the rejection of the "Sittason" order, coupled with the late entry and approval of the "Nelson" order, together with the activity of its soliciting agent being ratified by the Memphis office and its silence and inaction during a period of some six weeks, was tantamount to an acquiescence and participation in the fraud of its agent.

The other points argued for a reversal have also been reviewed but we have concluded they are without merit.

Affirmed.

LIVINGSTON, C. J., and GOODWYN, MERRILL and COLEMAN, JJ., concur.

HARWOOD, Justice (dissenting).

In the suit below the counts of the complaint sounded in deceit and claimed damages against the corporate defendants and against Kenneth Grauer as agent of the corporate defendants for alleged false and fraudulent representations made to the plaintiffs while the said Grauer was acting within the line and scope of his duties as agent for the corporate defendants.

The case went to the jury on counts 1 and 2, as last amended.

Count 1 claimed damages in that the defendant, Kenneth Grauer, acting within the line and scope of his employment as agent for the defendants, the Brunswick Corporation, and the Brunswick Pinsetter Corporation, for the purpose of inducing the plaintiffs to (1) pay the defendants $2000, (2) to place orders with the two corporate defendants respectively for bowling equipment, (3) and to refrain from purchasing bowling equipment from competitors of the corporate defendants, (4) to erect and operate a bowling alley using the corporate defendant's equipment, (5) and to place the plaintiffs in a position so that the defendants could be the only supplier of bowling equipment for bowling alleys to be erected by the

plaintiffs, or by any rival group, in the city of Hartselle, made certain representations to the plaintiffs, as follows: (1) That the defendants would not sell, in the city of Hartselle, bowling equipment to any parties other than the plaintiffs for a period of one year, (2) that the defendants would not deal with any other parties other than the plaintiffs in the city of Hartselle for a period of one year, (3) would either sell and deal exclusively with the plaintiffs and with no other parties in the city of Hartselle for a period of one year.

The complaint further alleges that such agreement would be legally binding if the plaintiffs would pay to the defendants the sum of $2000 with the understanding that if the plaintiffs dealt with any other parties within a period of one year the $2000 would be forfeited, and the plaintiffs were to place an order with the defendants for the purchase of bowling equipment.

It was further averred that the defendant, Kenneth Grauer, while acting within the line and scope of his employment as agent, servant, or employee of the corporate defendants, represented to the plaintiffs at the time he accepted the order for the bowling equipment and the $2000 from the plaintiffs, that the plaintiffs and the defendants then and there had a binding contract, that the defendants were bound to the plaintiffs and the plaintiffs were bound to the defendants and that the plaintiffs were then in the bowling business and should purchase real estate and begin the construction of a building as soon as possible; that the plaintiffs did not read the order blank which was filled in by said Grauer and explained to them.

The plaintiffs further averred that they relied upon the representations of Grauer, who was then and there acting within the line and scope of his employment as agent, etc., and they were induced by said representations to pay to the defendants the sum of $2000 and were induced to place an order with the defendants for 10 Brunswick automatic pinsetters and 10 bowling alleys, together with all necessary equipment, and

that in further reliance on said representations the plaintiffs agreed with the defendants to refrain from doing business with any of the competitors of the defendants.

The complaint further alleges that in reliance upon the representations of the defendants they purchased real estate, engaged the services of an architect and legal counsel, and spent great sums of money preparing for the erection of a building and in going into the bowling business.

It was further alleged that after the plaintiffs had undertaken these things the defendants refused to sell to the plaintiffs the contemplated bowling equipment and entered into an agreement with other parties to furnish them with bowling equipment in the city of Hartselle.

The complaint also alleged that the representations of the defendant, Grauer, acting within the line and scope of his employment, etc., were false and that "they were willfully made and knowingly false and were made for the purpose of deceiving the plaintiffs, and that such representations were made with intent not to perform."

The count concludes by claiming punitive damages.

Count 2 alleges substantially the same circumstances as does count 1, with the additional averment that at the time the defendant, Kenneth Grauer, "accepted the order for" bowling equipment and at the time he "accepted the said $2000 from the plaintiffs" he represented to the plaintiffs that "the plaintiffs and the defendants then and there had a binding contract, that the defendants were bound to the plaintiffs and that the plaintiffs were bound to the defendants, and that the plaintiffs were then in the bowling business and that they should purchase the real estate and begin the construction of a building as soon as possible."

The count further alleges reliance by the plaintiffs on these representations and concludes with the allegations that the aforesaid representations were false, and that they were:

"* * * willfully made and knowingly false, and were made for the purpose of deceiving the plaintiffs and that all of said representations which were in the form of a promise were made with the intent not to perform, and that the aforesaid representations of defendant Grauer that, to wit: the plaintiffs then and there had a binding contract, that the defendants were bound to the plaintiffs and that the plaintiffs were bound to the defendants, and that the plaintiffs were then and there in the bowling business and that they should purchase the real estate and begin the construction of a building as soon as possible were false, they were willfully made and knowingly false and were made for the purpose of deceiving the plaintiffs."

This count also concludes with a claim for punitive damages.

The trial below resulted in a verdict for the plaintiffs, their damages being assessed at $30,000. Judgment was entered pursuant to the verdict. The defendant's motion for a new trial being overruled, an appeal was perfected to this court.

In the trial below the plaintiff, Dr. Sittason, testified that he and the other plaintiffs became interested in going into the bowling business in Hartselle. A member of the group, Mr. Turner, had contacted Mr. Grauer and requested him to call Dr. Sittason. Mr. Grauer did telephone Dr. Sittason and a meeting was arranged with Grauer for the night of 10 February 1961. On that night Dr. Sittason and Mr. Paul Lee, another member of Dr. Sittason's group, met at a motel in Decatur. At this meeting Grauer "gave us an idea as to the cost of Brunswick equipment, and showed us charts and other papers." During this conference the question arose as to what protection the Sittason group would have if they did business with Brunswick against Brunswick dealing with other groups interested in placing a bowling alley in Hartselle. In response Mr. Grauer stated that if the Sittason group would make a down payment of $2000 and place an order with Brunswick for bowling equipment, Brunswick would deal solely with the Sittason group if they established a bowling business in Hartselle within a period of one year.

Grauer further told Dr. Sittason and Mr. Lee that he would contact other bowling equipment companies and other parties interested in putting a bowling alley in Hartselle and advise them that Brunswick had dealt with the Sittason group; and that Grauer further stated that even if Brunswick was not bound by such an agreement it would be unsound economically for Brunswick to deal with another group since a town the size of Hartselle would not support two bowling alleys.

Dr. Sittason testified that Mr. Grauer informed them that $4500 was the basic cost per lane and that ten lanes, ten pinsetters, with balls and equipment, would cost approximately $155,000. Dr. Sittason then told Mr. Grauer that he and Mr. Lee represented other parties, without mentioning their names, and that he would contact Grauer the next morning and that his group would make a decision before then as to whether they would accept the Brunswick proposition.

After leaving Mr. Grauer, Dr. Sittason went to the home of Mr. Cain and explained the Brunswick proposition to him, and also telephoned Mr. Turner and related the matter to him. The next morning, 11 February 1961, Dr. Sittason telephoned Mr. Grauer and told him that the group had decided to accept his proposal and asked Grauer to come by his office. Mr. Grauer arrived at Dr. Sittason's office at approximately noon. Briefly they went over their conversation of the previous night, and Grauer filled out orders for the equipment. One order was to the Brunswick-Balke Collender Company for ten bowling lanes, and additional equipment and supplies, the total cost of which was $52,957.50. The second order was to the Brunswick Automatic Pinsetter Company for ten pinsetters, and the total purchase price of this order was $103,821.80.

Dr. Sittason testified that he glanced at the orders and did not read them thoroughly before signing them. At this time Dr. Sittason delivered to Mr. Grauer two cashiers checks, each in the amount of $1000, and payable respectively to the Brunswick Corporation, and the Brunswick Pinsetter Corporation. Grauer took the signed orders and the two checks and informed Sittason that they were in the bowling business, and that they were bound to each other and for the Sittason group to go ahead and procure a building. Grauer than left and Dr. Sittason immediately telephoned Mr. Cain and Mr. Turner and informed them that he had given Mr. Grauer the two checks and had placed an order for the bowling equipment.

Thereafter Dr. Sittason, Mr. Turner, Mr. Cain, Mr. Lee, and Dr. Lavender purchased a tract of land at the price of $12,500. Dr. Lavender, Mr. Lee, and Dr. Sittason each had a one-fourth interest, while Mr. Cain and Mr. Turner each had a one-eighth interest in the purchased land.

The next contact Dr. Sittason had with Grauer was a telephone conversation on 4 March 1961. He told Grauer of the purchase of the property and that plans for a building to be erected thereon were in the hands of an architect. Dr. Sittason further told Mr. Grauer that a Mr. Jack Nelson from Huntsville had informed a member of the Sittason group that Nelson and some other parties were going to put a bowling alley in Hartselle and were going to deal with Brunswick. Grauer replied that he had not heard of Jack Nelson and that he was coming to Hartselle to meet with the Sittason group and their architect at the building site.

On 15 March 1961, Grauer came to Hartselle and went to the building site with Dr. Sittason, Mr. Lee, their architect, Mr. Tuggle, and their engineer Mr. Blevins. At the site Mr. Grauer discussed with the group the locating of the building and some wiring requirements, and agreed to meet with Mr. Tuggle and Mr. Blevins later that night in Huntsville to discuss wiring requirements.

On 19 March 1961, Dr. Sittason talked with Grauer by telephone. Grauer told Dr. Sittason that it was necessary for him to come to Hartselle to talk to another group interested in starting a bowling alley. This other group, according to Grauer, consisted of Gene Newman, Hubert Mitchell, and Jack Nelson. Dr. Sittason told Grauer he could not understand why he would talk with this other group in view of their agreement, and Grauer replied that he had to talk with this other group, but it didn't necessarily mean anything, and that it would be well for the Sittason group to start their building as soon as they could. Dr. Sittason told Grauer that bids for their building were to be opened on Tuesday 21 March 1961. On 22 March 1961, Dr. Sittason again talked with Grauer by telephone. He told Grauer he had been informed that Grauer had taken an order from the other group interested in putting a bowling alley in Hartselle, and that he had told this other group that he would deal with them if they started their building first. Grauer replied that he had taken an order from the other group but that if the Sittason group would start their building the next morning he would still deal with them. Dr. Sittason told Grauer that their building could not be started before the following Wednesday morning because the plans were in the hands of four or five contractors who were to bid on the same.

The rival Nelson group started the foundation for their building on Tuesday 22 March 1961.

On 16 March 1961, Dr. Sittason placed a telephone call to the Brunswick Corporation office in Memphis, Tennessee, and talked to a man by the name of John Wackowski. This call was to obtain the necessary forms to change the equipment orders from the individual name of Dr. Sittason to a corporate name. Wackowski stated that Brunswick would be glad to

change the order as requested and he would forward the necessary forms. Later Dr. Sittason received this material by letter postmarked 22 March 1961. On 28 March 1961, Brunswick notified Dr. Sittason they were not going to "deal with us," and the $2000 deposit was returned by Brunswick about the middle of April 1961.

Neither of the corporate defendants furnished any bowling equipment to the Sittason group, but did place Brunswick equipment in another bowling alley in Hartselle owned by Gene Newman of the Nelson group, and known as the Brunswick Bowling Barn.

On cross examination Dr. Sittason testified that he had no knowledge of Grauer's position with the corporate defendants other than what Grauer told him, that he knew that the papers which he signed were orders, and contained paragraphs stating they could either be accepted or rejected and that Grauer made a comment to that effect. However, Dr. Sittason testified that based on the representations made to him by Grauer he understood that the Chicago office of the corporate defendants could reject the orders if the credit of the Sittason group was not sufficient, and knowing their credit was good he never entertained the thought that the orders would be rejected.

Dr. Sittason further testified that in placing the orders he considered himself a representative of his group, and informed Grauer that he was dealing with him as an agent of a corporation that was to be formed.

Around the first of April 1961, Dr. Sittason and his group began negotiations with AMF for the purchase of bowling equipment, and did procure this equipment and did establish a bowling alley on the land they had purchased.

On redirect examination Dr. Sittason testified that Grauer had led him to believe that the credit check was more or less a formality, it being obvious that the papers would have to go through some channels before being finally consummated. The papers were filled out by Grauer while in his office on 11 February 1961, and he did not read them but upon the signing of the orders Grauer stated they were in the bowling business, had a binding agreement and to go out and get land and a building.

Paul Tuggle, the architect for the plaintiffs, testified that he first saw Grauer on the afternoon of 15 March 1961, at a motel in Huntsville. Grauer gave him some constructive criticism relative to the proposed building for the bowling alley and some literature as to the electrical wiring. On that same date Tuggle met with Grauer, Dr. Sittason, Mr. Lee, and Mr. Blevins at the site of the proposed building. Grauer commented that the site was well suited for a bowling center. That same night he met with Grauer and went over the plans of the proposed building. Grauer furnished him some literature concerning the installation of the bowling equipment in the building, and suggested that the footing for the building be installed as soon as possible.

On 22 March 1961, Mr. Tuggle, apparently after learning that another group was to get Brunswick equipment, telephoned Grauer in Florida. Tuggle asked Grauer why he had sold out to another party. Grauer replied he had not sold out, that the bowling equipment business was highly competitive and that if Brunswick didn't sell the equipment then their competitors would, and that he had to sell to whoever put a footing in the ground first, thus indicating good faith.

Subsequently to this conversation the plans for the proposed building were redrawn. Mr. Tuggle stated that his fee for drafting the plans and specifications of the original building was $900.

Mr. Paul Lee Jr., a witness for the plaintiffs, testified that he and Dr. Sittason met with Grauer on the night of 10 February 1961, and Grauer had with him literature explaining the advantages of Brunswick equipment. They discussed the financial arrangements and the number of lanes that

should be installed. Mr. Lee's testimony was also corroborative of Dr. Sittason's relative to Grauer telling them that upon the payment of $2000 with the orders for equipment that they would be in the bowling business and that he would deal exclusively with them, and that Brunswick would not deal with anyone else in Hartselle for a period of one year. Mr. Lee was also present on a visit to the site on 15 March 1961, and at this time Grauer discussed how to face the building and other matters, and also stated that they needed to get started.

Mr. Lee further testified that in his deposition that he had said that he understood that the papers signed by Dr. Sittason were orders subject to being accepted or rejected, but that after Grauer's sales talk he did not think there was any right to reject the orders other than it was determined that the Sittason Group did not have any finances.

On redirect examination Mr. Lee testified that Mr. Grauer at no time stated that Brunswick would deal only with the person who first started the foundation for a building in Hartselle.

Hubert Mitchell, a witness for the plaintiff, testified that he first met Grauer on 20 March 1961. At the time Grauer stated that he was a salesman for the Brunswick Corporation.

At this meeting Grauer told Mitchell that he had an application for the purchase of equipment from the plaintiffs in this case and that he would take one from the Mitchell-Nelson group on the basis that whoever poured concrete first and had satisfactory credit would have their order accepted.

Plans were made at this meeting to start a building the next morning and concrete was poured the next morning.

Mr. Bob Gilchrist, a witness for the plaintiffs, testified that he was one of the attorneys for the plaintiffs, Dr. Sittason having first consulted him sometime subsequent to a meeting with Grauer on 11 February 1961.

On March 22, 1961, Mr. Gilchrist placed a telephone call to one John Wackowski at the Brunswick office in Memphis, Tennessee. Mr. Wackowski was not in, but the next day, 22 March 1961, returned Mr. Gilchrist's call. Mr. Wackowski identified himself as office manager of the bowling division of the Brunswick Corporation in Memphis, Tennessee. Mr. Gilchrist told Mr. Wackowski that he was the attorney for the Sittason group which had come to an agreement with their representative Grauer; that they had relied on what Grauer had told them; had purchased land, engaged an architect, and had employed him, and they took the position that they had a binding agreement with the Brunswick Corporation. Mr. Gilchrist further told Mr. Wackowski that in the past few days the Sittason group had been informed that Grauer had taken an order from another group. Wackowski replied, "You have such a contract," and that there was nothing in his office indicating that other parties were being dealt with, though he, Wackowski, would check on the matter and call Mr. Gilchrist back.

On 24 March 1961, Mr. Wackowski called Mr. Gilchrist and stated that he had contacted Grauer and had determined that Grauer had taken an order from the Mitchell group but that the order had not been received in the Memphis office. Mr. Wackowski further stated that he was turning the whole matter over to his superior Mr. Bartelme.

On cross examination Mr. Gilchrist testified that Mr. Wackowski had told him that the Sittason order was the only one from Hartselle and that they had a contract. The next day Mr. Wackowski called back to say that Brunswick did have another order and that he was turning the matter over to Mr. Bartelme.

Four days after his last conversation with Mr. Wackowski, that is, on 28 March 1961, Dr. Sittason received a telegram noti-

fying him that Brunswick was rejecting the order of Dr. Sittason's group.

Mr. Gilchrist further testified that he had examined the titles of the land purchased by the Sittason group, had had meetings with the group as to how the business was to be set up, and had later set up a corporation for the Sittason group and had had several telephone conversations in the negotiations with the Brunswick Corporation. His fee for legal services had been $475.

On cross examination Mr. Gilchrist testified that the title to the land and buildings was owned by the five individuals in the Sittason group as partners and not by the corporation.

For the defendants, Mr. Gene Newman and Mr. Jack Nelson, testified to the effect that one of their group contacted Mr. Grauer and met with him on 21 March 1961, in reference to opening a bowling alley in Hartselle. Prior to this meeting they had never seen or heard of Mr. Grauer. At this meeting Grauer stated that he had orders from other parties in Hartselle or that he had had an agreement with other parties and had received money but that it was the policy of his company to deal with whoever poured concrete first subject to credit approval.

Mr. John Wackowski testified that he is employed by the Brunswick Corporation in the Memphis branch office. His title is office manager. He supervises four stenographers, a shipping clerk, and his work is of a clerical nature. On occasions he takes calls that come into the office when Mr. Bartelme is absent. He exercises no supervision over Mr. Grauer or other salesmen but processes "the orders they send in to the Memphis office and forwards them to Chicago."

Mr. Wackowski testified that in the first telephone conversation with Mr. Gilchrist he had been asked if there were any other orders for bowling lanes in Hartselle and he had said they did not have such orders but that Mr. Gilchrist should talk with Mr. Bartelme. In the second conversation with Mr. Gilchrist, they again discussed if there were any other orders from Hartselle. Mr. Gilchrist asked him to confirm the order of his clients but he informed Mr. Gilchrist he had no authority to confirm orders. Mr. Wackowski denied that at any time he stated to Mr. Gilchrist that he personally guaranteed any agreement of Grauer's or that the Brunswick Corporation guaranteed any agreement.

On cross examination Mr. Wackowski testified that Mr. Gilchrist had told him that Grauer had taken an order from another group and he had replied that Mr. Grauer was acting in good faith, that he would get in touch with Grauer about the matter.

Thereafter he received a letter from Mr. Gilchrist on March 27, 1961 and immediately turned it over to Mr. Bartelme. This letter from Mr. Gilchrist had been received in evidence. It is dated 23 March 1961, addressed to Mr. John Wackowski, Brunswick Corporation, Memphis, Tennessee, and states that it was verifying the telephone conversation of that day wherein Mr. Gilchrist had advised Mr. Wackowski that his clients took the position that they had a valid and binding contract with Brunswick obligating Brunswick to refrain from leasing, selling, or otherwise doing business with any other person for the purpose of operating a bowling alley in the city of Hartselle; the said agreement was entered into between Dr. Sittason and the Brunswick Corporation's authorized agent, Grauer, for and in consideration of the sum of $2000 as earnest money for the said agreement. Mr. Gilchrist further wrote Mr. Wackowski, "In reliance upon your ratification of the agreement by telephone conversation with us on this date, we are proceeding as originally planned."

Mr. Gilchrist then set forth in his letter the action of the Sittason group in acquiring land, etc. The letter then continues, "We have advised them to withhold signing the construction contract until we have received written ratification from the Brunswick Corporation of the agreement by Brunswick not to engage in the bowling

business with any other parties in the city of Hartselle, Alabama, and to otherwise clarify our status with the Brunswick Corporation."

Mr. Gilchrist further stated in his letter that he had completed the articles of incorporation for the proposed Hartselle Recreation Center, Inc., and that he had been advised that Brunswick wanted a financial statement and certain corporate resolutions, and that he understood from the telephone conversation they had been forwarded to Dr. Sittason, and that as soon as received he would file the articles of incorporation, adopt the resolutions and forward a financial statement. The letter continues:

"However, before doing this, we urgently request a written ratification of the agreement by Brunswick Corporation to deal with our clients and obligating Brunswick to refrain from dealing with other parties in Hartselle, Alabama.

"I appreciate your courtesy and cooperation in this matter and I advised my clients of our conversation this morning telling them that you personally backed up the agreement and that Brunswick backed up the agreement and that you stated to me that that was not the way Brunswick operated and that you would immediately find out what the source of misunderstanding might be."

Upon receipt of this letter, Mr. Wackowski turned it over to Mr. Bartelme. Mr. Bartelme testified for the defendants that he was branch manager for the Brunswick Corporation in Memphis, Tennessee. When Mr. Gilchrist's letter was turned over to him by Mr. Wackowski he wired Dr. Sittason the next day, 29 March 1961, that it would be improper to honor his orders as construction had started on another installation which made the Sittason operation a poor business risk and "we therefore are arranging cancellation of your order and full return of your deposit."

Mr. Bartelme further testified that Mr. Grauer's duties were to obtain orders for bowling equipment which he forwarded to the Memphis office. He had never authorized Grauer for and on behalf of Brunswick to enter into any agreement with any group to the effect that Brunswick would deal only with that party in a given locality, and Grauer had no authority as agent or employee of the corporate defendants to make such an agreement.

Mr. Wackowski's work is clerical and he does not approve orders submitted to the Memphis branch, nor does he (Bartelme) have any authority to approve orders, and he has never done so. Orders are submitted to the Chicago office where the legal and credit departments act upon them. Mr. Grauer does not have a written contract of employment with Brunswick nor does any salesman.

William L. Niemann, the general attorney and secretary for the Brunswick Corporation, testified that he is familiar with the normal course of processing applications and orders for equipment to be purchased from the Brunswick Corporation. An order is accepted by letter from Mr. R. F. Bensinger, Chairman of the Board of the Brunswick Corporation. Prior to action by Mr. Bensinger there is credit approval and legal approval of the order.

Kenneth Grauer testified that he is employed as a salesman by the Brunswick Corporation. His duties are to take orders for bowling equipment which are forwarded to the Memphis branch. He took the orders from Dr. Sittason and told him that the orders were expressly subject to credit approval. At Dr. Sittason's request he met with the architect and engineer and made suggestions concerning their building. Subsequent to this meeting he received a telephone call from Mr. Jack Nelson, who requested that he come to Hartselle and talk with him and some other people. He met with Mr. Nelson on 20 March 1961. He then telephoned Dr. Sittason and told him of this meeting and that if someone else poured concrete and started some actual

construction of a building, then Dr. Sittason would not want to go into the bowling business in Hartselle.

At his meeting with the Nelson group on 20 March 1961, Grauer stated that he explained to this group that he already had an order from Dr. Sittason, and they replied that they were ready to go ahead. He explained that the only way they could tell whether a prospective purchaser was in earnest was to see some visible evidence of construction. He told them they would have the same opportunity to buy Brunswick equipment as Dr. Sittason did.

Grauer took an order from the Nelson group and thereafter returned to Hartselle and found that this group had poured the concrete for the footings and that no construction had been started at Dr. Sittason's site.

Grauer denied that he had had any agreement with Dr. Sittason not to sell bowling equipment to any other party in Hartselle, and had no authority to make any such agreement.

In rebuttal, Dr. Sittason testified that Grauer had never told him that he was going to deal with a group that poured concrete first, and the first time he made such a statement was on 21 March 1961, after the Nelson group had already poured concrete. On cross examination in rebuttal Dr. Sittason testified that he never knew that there was any significance about starting a building first with regard to Brunswick's dealing with another group.

Since there was no written agency contract executed by the corporate defendants with Grauer, their liability, if any, must arise from the asserted agreement of their agent, Grauer, only if made while acting within the line and scope of his employment.

The burden of proving an agency rests upon the party asserting its existence. Capital Security Co. v. Owen, 196 Ala. 385, 72 So. 8. In this connection Dr. Sittason testified he had never known Grauer prior to their meeting on 10 February 1961, and the only thing he knew of Grauer's authority was what Grauer told him. This in no wise tends to show the real authority of Grauer as agent for the corporate defendants. A person dealing with a known agent is not authorized under any circumstances blindly to trust the agent's statements as to the extent of his power. Johnson v. Shook and Fletcher Supply Co., 245 Ala. 123, 16 So.2d 406.

In United States Bedding Co. v. Andre, 105 Ark. 111, 114, 150 S.W. 413, 41 L.R.A., N.S., 1019, the authority of a traveling salesman is set forth as follows:

"The purpose for which a traveling salesman is employed is to solicit orders and make sales of goods. Unless he is specially authorized to do so, he has no implied authority to do any act other than is usually done by other salesmen of like character; that is, to do those things and make those agreements which are necessary and usual to accomplish the purpose of this agency. Being employed for one purpose, he has no authority to do another, either actual or implied."

To like effect is Commerce Furniture and U. Co. v. White Sewing Machine Co., 94 Okl. 299, 222 P. 516, and Peaslee-Gaulbert Co. v. Rogers, 220 Ky. 338, 295 S.W. 137, 55 A.L.R. 377.

Dr. Sittason testified that he knew that the two papers he signed were orders, i. e., offers. Each order contained provisions that the buyer had read and understood all of the provisions of the order, and that no other representations had been made to induce the order; that the buyer understood that no agent or sales representative of the seller had any authority to alter the conditions of the order, and that no such representations should be binding on the seller unless accepted in writing by the seller, and that the order should not be binding upon the seller until accepted in writing by a duly authorized officer of the seller at its office in Chicago, Illinois.

No clearer limitations on Grauer's authority could have been expressed by his corporate principals, and clearly no ostensible authority in Grauer, other than as a salesman, can be inferred.

While Dr. Sittason testified that he only glanced at the orders, or did not read them thoroughly before signing them, a party who signs a written instrument, being able to read and understand the language in which the instrument is written, is presumed to know and understand the contents thereof, and is bound thereby, unless the actual execution of the instrument was procured by fraud. Capital Security Co. v. Owen, 196 Ala. 385, 72 So. 8. His ignorance of the contents of the instrument, under such conditions, being attributable to his own negligence. Pacific Guano Co. v. Anglin, 82 Ala. 492, 1 So. 852.

Here there was no effort on the part of Grauer to prevent the plaintiff from reading the orders, nor any misrepresentation of the contents of the orders. At most there was a statement by the agent Grauer that Brunswick would not deal with others in Hartselle for a period of one year, upon the payment of $2000, etc. The orders, had Dr. Sittason exercised ordinary business precaution to read them, would have shown him that the corporate defendants were in no way bound by the alleged statements of Grauer. Capital Securities Co. v. Gilmer, 190 Ala. 340, 67 So. 258.

The promises by Grauer were in the teeth of the orders executed by Dr. Sittason. Every person has a constitutional right to limit the powers of his or its agents. When an agent's powers of representation are limited in the very written orders signed by a buyer dealing with an agent, and the principal reserves the right to accept or reject the order, nothing more can be done by the seller-principal to protect himself, and the buyer, with such information, acts at his peril if he relies upon the representations of an agent beyond the scope of his clearly designated authority. J. B. Colt Co. v. Odom, 136 Miss. 651, 101 So. 853; Barnebey v. Barron G. Collier, Inc., (CCA 8) 65 F.2d 864.

As stated in Tips v. Barneburg (Tex. Civ.App.) 276 S.W. 932:

"Too often men make trades and enter into foolish contracts on their mistaken judgment and then raise the cry of fraud to relieve them of the consequences, but the courts of the country will not assume the guardianship of the affairs of such men, nor encourage such claims for damages or a cancellation of the contracts. The law does not place a premium on negligence or unreasonable credulity. Prudence and diligence should be exercised in the execution of contracts, and in the purchase or exchange of property the law will apply the doctrine of caveat emptor when there is a want of ordinary care shown by the purchaser."

The above principles are crystalized in Sec. 260(1) of the Restatement of the Law-Agency, which provides:

"An innocent principal can, by contract with another, relieve himself of liability for deceit because of unauthorized fraud by a servant or other agent upon the other party."

Under the comment to this section it is stated:

"When he" (principal) "has given notice to the person dealing with the agent that the latter has no authority to make representations not included in the contract signed by the other party, the principal has done all that is possible to warn the other party not to rely on the agent's statements. It is therefore not unfair to relieve him of tort liability."

Counsel for appellee argues that the agreement of Grauer was ratified by the corporate defendants. Any ratification must spring from the actions of Wackowski and Bartelme, employees in the Memphis office of the corporate defendants. As to Bartelme, the evidence shows that upon

Mr. Gilchrist's letter being called to his attention, he wired Dr. Sittason the following day that Sittason's offers would not be accepted. No ratification can be inferred from Bartelme's conduct.

Wackowski is characterized in the evidence as "office manager" in the Memphis branch. He and Bartelme described his duties as clerical only. There is no evidence from which additional authority can be inferred. In view of the provisions in the orders that they could be altered only in writing by officials in the office in Chicago, Wackowski was without authority to ratify any agreement made by Grauer, and this fact must be deemed to have been known by Dr. Sittason, or those acting for him. What we have written in reference to Grauer's authority to bind the corporate defendants is equally applicable to Wackowski's authority to do so.

It is true that the authority of an agent may be implied from the custom or usage of a trade. Such custom must be so well settled, notorious, and continuous, as to raise a fair presumption that it was known to the buyer and the seller, and that sales were made in reference to it. It is incumbent upon one asserting such custom to prove it. Herring v. Skaggs, 73 Ala. 446. In the present case there is no evidence tending to show that it is the custom of the business of selling bowling equipment that such sale is upon the basis of a custom of the trade that such equipment will not be sold in the same locality to others. In the absence of such proof we cannot take judicial notice that such custom exists.

Assignment of error 4 relates to the action of the court in refusing written charge 2, which is affirmative in nature as to the defendant, The Brunswick Corporation.

Assignment of error 5 asserts error in the refusal of requested written charge 3, which was affirmative in nature as to the defendant, The Brunswick Automatic Pinsetter Corporation.

Assignment of error 34 relates to the refusal of written requested charge no 21 which is affirmative and peremptory as to the corporate defendants on the basis that Grauer was a soliciting agent for the corporate defendants and without authority to bind the corporate defendants by the agreements as to not dealing with other parties, that the plaintiffs were in the bowling business, etc. Charge 34 is quite lengthy and we have not attempted to set it out in full.

Assignments 4, 5, and 34 are argued jointly, and the argument is addressed toward the failure of the evidence to prove that Grauer was acting within the line and scope of his agency in making the alleged deceitful statements, and therefore no liability can be imposed on the corporate defendants because of Grauer's alleged conduct.

Under the evidence we are clear to the conclusion that such contention is correct. The court therefore erred in refusing charge 2, requested by The Brunswick Corporation (Assignment of error no. 4), and charge 3 requested by The Brunswick Automatic Pinsetter Corporation (Assignment of error no. 5).

These assignments are argued jointly and in bulk with assignment 34, relating to refused charge no. 21.

All of these requested charges are related and raise a single question. It was proper to group them for argument in brief. Wells Co. v. Lane, 217 Ala. 10, 115 So. 77. No need arises to consider the technical validity of refused charge 21, and we pretermit this point for the rule that if assignments are argued in bulk, and one assignment is not well taken, then review of the other assignments will be pretermitted, cannot here properly be invoked. White Dairy Co. v. Sims, 230 Ala. 561, 161 So. 812; Boohaker v. Trott, 274 Ala. 12, 145 So.2d 179.

The defendants were sued jointly and the general verdict and judgment was rendered against all the defendants. Punitive dam-

ages were claimed. The only evidence introduced by the plaintiffs tending to show actual damages was that they had paid $12,500 for a lot on which they had erected a building, $900 as a fee to the architect, $475 as a fee to their attorney, and $25 as the cost of erecting a sign on the lot.

Counsel for appellants argue strenuously that proof as to damages was insufficient as to all of the defendants. We pretermit consideration of this question, as it is obvious that a good portion of the damages of $30,000 was punitive in nature.

At common law a judgment against two or more defendants jointly was regarded as an entirety, so that a reversal of the judgment as to one defendant required a reversal as to all. Some of our earlier cases reflect this rule. See Huckabee v. Nelson, 54 Ala. 12; Massey v. Oates, 143 Ala. 248, 39 So. 142, 143; Lawrence v. Stone, 160 Ala. 382, 40 So. 376. This technical rule has now been modified to the extent that where a judgment, though joint in form is several in effect, and the interests of the parties are several and independent, then such judgment is not necessarily considered entire, and such judgment may be reversed as to one or more of the defendants and not as to the other. Young v. Woodward Iron Co., 216 Ala. 330, 113 So. 223, on rehearing. This relaxation of the original rule, however, has never been applied where it might work an injustice to one party defendant if the judgment were to remain intact as against him while reversed as to another defendant. In such case the power exists in the court to reverse the judgment in toto as to all defendants. City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276; Luquire Ins. Co. v. Parker, 241 Ala. 621, 4 So.2d 259; Zemczonck v. McElroy, 264 Ala. 258, 86 So.2d 824.

Where a verdict and judgment awards punitive damages, the courts of our sister states have taken the view that the reversal of the judgment as to one of several tort feasors requires the reversal of the judgment as an entirety. This for the reason that, to say the least, it is uncertain whether the jury would have returned so large a verdict against the lesser number of defendants had they not been yoked with the others. Webber v. Town of Jonesville, 94 S.C. 189, 77 S.E. 857; Calhoun v. Southern Railway Co., 115 S.C. 489, 106 S.E. 780; Schloss v. Silverman, 172 Md. 632, 192 A. 343; Sawin v. Nease, 186 Okl. 195, 97 P.2d 27; Harrington v. H. D. Lee Mercantile Co., et al., 97 Mont. 40, 33 P.2d 553; Mellon v. Kelly, et al., 99 Mont. 10, 41 P.2d 49.

The Montana court has further stated that where an award for damages is largely in the discretion of the jury, without the aid of any definite testimony by which to gauge the amount of the verdict, then the rule as to considering a judgment as a joint judgment should apply, and the later relaxation of the rule permitting an affirmance as to one appellant and a reversal as to another cannot with justice be invoked. See Montana cases cited above.

Clearly in the present case it cannot be said with any degree of certitude that the jury would have assessed such large punitive damages against Grauer had he not been tied to the corporate defendants. Since the judgment must be reversed as to the corporate defendants it would be manifestly unjust in this case not to treat the judgment as an entirety.

For the above reasons I would reverse the judgment.